DECISION
Plaintiff appeals the real market value (value) of industrial property identified as Account 1650314 (subject property) for the 2009-10 tax year. A telephone trial was held on January 24, 2011. David Carmichael (Carmichael), Attorney at Law, appeared on behalf of Plaintiff. Dan Montgomery (Montgomery), a member of Plaintiff, testified on behalf of Plaintiff. David W. Sohm (Sohm), Registered Appraiser 3, Lane County Department of Assessment and Taxation, appeared and testified on behalf of Defendant.
 I. STATEMENT OF FACTS
The subject property consists of "[t]wo single story metal buildings with 13 tenant spaces on a 1.37 acre paved lot" located at 2145 and 2155 Getty Circle, Cottage Grove, Oregon, which is about 20 miles south of Eugene, Oregon. (Def's Ex A at 4.) The property is located at the south end of Cottage Grove in a 17 lot industrial subdivision. (Id. at 5.) The lot is improved "with 38,000 square feet of asphalt paving." (Id. at 8) Montgomery testified that the improvements were constructed during 2007 and 2008. The total area of the two structures on the lot is 21,500 square feet. (Id.) The building walls are made of "steel frame with enameled metal cover" and are 12 feet high, which Montgomery testified are lower than most other similar buildings. (Id.) Montgomery testified that, going into the project, he thought that there was a *Page 2 
market for buildings such as the subject, but has since concluded that most industrial tenants prefer properties with higher ceilings and walls.
Plaintiff did not submit any information regarding the highest and best use of the property. Defendant analyzed the highest and best use of the property and concluded that "[t]he existing flex industrial use of the buildings represents a physically possible, legally permitted, and financially feasible use of the property and is concluded to be representative of the highest and best use of the property as improved." (Id. at 10.)
Both Montgomery and Sohm testified extensively about the effects of the recession on property values, but differed with respect to whether the recession was readily apparent in the market as of January 1, 2009. Montgomery testified that the market declined in late 2008; leasing had virtually ceased as of July 2008. He testified the subject property was first listed for lease in early 2008 and has been continuously listed since that time; he had three new tenants in the first half of 2008, but no new tenants between July 2008 and July 2009. Sohm testified that, while the market had begun to decline in late 2008, the effects were not felt until mid-2009; he testified that the unemployment rate in Lane County had risen to 8.4 percent as of January 2009, but did not reach 12.1 percent until August 2009. Sohm also testified that Defendant has applied a 21 percent downward trend to 2010-11 values in recognition of the market decline.
Both Plaintiff and Defendant determined the value of the subject property as of the assessment date, January 1, 2009. Montgomery testified that the cost approach is the least relevant in this case because he would have to sell the subject property for less than the cost of building it. Sohm testified that the sales comparison approach is the least relevant because none of the comparable sales identified by either party were very similar to the subject property. *Page 3 
A. Cost Approach
Plaintiff did not provide detailed cost information regarding the subject property. In a letter dated July 15, 2010, Carmichael stated that Montgomery reported a land cost of $105,000 (as of January 2007) and construction costs of $550,000, for a total cost of $655,000. (Ptf's Ltr, Jul 15, 2010.) At trial, Montgomery revised that cost estimate to include $32,750, or five percent, for entrepreneurial profit. He testified that he did not collect that profit as his contribution to the partnership. Montgomery testified that the construction cost was particularly low because his partner, the builder, is the lowest cost builder in the county; however, he thought another builder could have achieved similar costs. Sohm disagreed, testifying that the actual construction costs reported by a "low end builder building for himself" are not representative of the market. At trial, Montgomery concluded a value of $687,750 under the cost approach.
Sohm determined the land value by considering four comparable sales in the Cottage Grove area, one of which was the subject site on January 26, 2007, for $105,000. (Def's Ex A at 12.) The City of Cottage Grove was the seller in the sale of the subject site and two of the other comparable land sales identified by Sohm. (Id.) Sohm concluded that, with respect to those three sales, "the seller's motivation was to generate economic development, not to maximize price." (Id.) His fourth sale was "the resale of one of the lots purchase[d] in the [third sale] at a substantially higher price per square foot[,]" which he concluded to be "the only sale reflecting typical buyer and seller motivation and is judged to reflect market value far better than the other sales." (Id.) The fourth sale occurred on July 23, 2007, at $2.46 per square foot. (Id.) After adjusting for a few differences between the size and shape of the properties, Sohm concluded a price per square foot of $2.30 for a total land value of $137,000, rounded, as of January 1, 2009. (Id. at 13.) *Page 4 
Sohm calculated an improvements value under the cost approach by estimating the replacement or reproduction cost based on the Marshall Cost Estimator. (Id. at 13-15.) He testified that he made adjustments for factors impacting the price of the subject such as the lower wall and ceiling height. Sohm identified the typical range of entrepreneurial profit ("developer's profit") as five to 20 percent. (Id. at 14.) Sohm determined that ten percent entrepreneurial profit was an appropriate number in this case, as of January 1, 2009. (Id.) He testified that he would always include entrepreneurial profit unless the building was owner occupied. Sohm concluded a total value of $1,199,000, rounded, under the cost approach. (Id. at 15.)
B. Income Approach
Montgomery calculated the value of the subject property under the income approach at both 20 percent and 30 percent vacancy, identifying values of $632,600 (rounded) at 20 percent vacancy and $526,544 at 30 percent vacancy.[1] (Ptf's Ex 1 at 2.) He calculated potential gross income of $103,200 using a price of $.40 per square foot. (Id.) Montgomery testified that all of Plaintiff's units are rented via gross leases. Plaintiff currently has five tenants, two of which moved into the property in May and June 2008; each currently pays $.50 per square foot. (Id at 3.) He testified that two other tenants negotiated their leases for $.33 per square foot in July and December 2010. He testified that Plaintiff's fifth tenant originally leased space in early Summer 2008 at $.50 per square foot and rented additional space in January 2010, at a lower rate, for an average rent of $.33 per square foot. Montgomery testified that Plaintiff had one other tenant who leased a unit for $.50 per square foot in early 2008, but was ultimately evicted *Page 5 
for failing to pay rent. Montgomery testified that Plaintiff had no new tenants between July 1, 2008, and July 1, 2009. Montgomery testified that the current asking rent for the subject is $.50 per square foot, but he would rent the next unit at $.30 per square foot "in a heartbeat."
Montgomery identified four rent comparables; one in Veneta, two in Cottage Grove, and the fourth in Creswell. (Ptf's Ex 1 at 5.) The Veneta property rents units at $.40 per square foot under a gross lease. (Id.) The Cottage Grove properties each rent units at $.25 per square foot under triple net leases. (Id.) The Creswell property was constructed by the same builder who constructed the subject property and is the same type of construction as the subject property; it rents units at $.40 per square foot under a gross lease. (Id.)
Montgomery testified that the subject property's actual vacancy has been about 45 percent since 2008, but he considered 30 percent to be more realistic in the long term. He also calculated the value at 20 percent vacancy, noting that rate is probably preferable to Defendant. Montgomery determined a vacancy and credit loss allowance of $20,640 at 20 percent and $30,960 at 30 percent. (Ptf's Ex 1 at 2.)
Montgomery identified expenses in the amount of $25,625, at 20 percent vacancy, and $24,851, at 30 percent vacancy. (Ptf's Ex 1 at 2.) His expenses included $1,843 for insurance, $1,200 for maintenance, $3,060 for utilities, $750 for advertising, $200 for "Bank Serv. Charges," $1,080 for "Accounting Legal," $13,106 for property taxes, and a five percent management fee. (Id.) At trial, Montgomery testified that he did not recall how he determined $13,106 for property taxes. He testified that the management fee is not currently being charged to Plaintiff and conceded that it should be less than what is listed on his expense sheet.
Montgomery calculated a net operating income of $25,625 at 20 percent vacancy and $47,389 at 30 percent vacancy. (Ptf's Ex 1 at 2.) He determined a capitalization rate of nine *Page 6 
percent to be appropriate. (Id.) His comparable sales indicated capitalization rates of 10.1 and 10.9 percent; his comparable option indicated a rate of 9.6 percent. (Id. at 4.) Using the nine percent capitalization rate, Montgomery determined the subject property's value to be $632,000 (rounded) at 20 percent vacancy and $526,544 at 30 percent vacancy. (Id. at 2.)
Sohm concluded a value of $912,000 (rounded) under the income approach. (Def's Ex A at 21.) Sohm determined a rental rate of $.45 per square foot, based on a comparable property located in Eugene and also identified by Sohm as his fourth comparable sale. (Id. at 19, 17.) Carmichael questioned Sohm's choice of that property as a comparable given its location in Eugene, a larger market than Cottage Grove. Sohm responded that the property is most similar to the subject property because it has shorter walls and is a multi-tenant building. Using a rental rate of $.45 per square foot, Sohm calculated potential gross income of $116,100. (Id. at 19.)
Sohm noted that the subject's vacancy as of September 16, 2010, was 49 percent. (Id.) However, he testified that he does not believe that number represents a realistic, "stabilized occupancy" over the long term. (Id. at 19-20.) He concluded that a 15 percent vacancy is appropriate in this case, for a vacancy and credit loss allowance of $17,415. (Id. at 20.) Sohm calculated total expenses for the subject of $26,391, or 26.7 percent of projected effective gross income. (Id.) In calculating expenses, Sohm used several figures reported by Montgomery, including $1,843 for insurance, $1,200 for maintenance, and $3,060 for utilities. (Def's Ex A at 20; Ptf's Ex 1 at 2.) He did not include Montgomery's reported accounting and legal expenses, advertising expenses, and bank services charges because those "are typically considered part of basic management in a property of this type." (Def's Ex A at 20.) Sohm included a five percent management fee, or $4,934. (Id.) Sohm included $18,414 in property taxes, which was "the actual 2009 tax assessed" for a net operating income of $72,294. (Id.) *Page 7 
Sohm determined a capitalization rate of eight percent based on three comparable sales which indicated capitalization rates "between 8.00% and 8.85%. The high indication is from a sale that reflects a high rate due to the motivation of the seller and a lower rate would be applicable to the subject." (Def's Ex A at 21.) Sohm concluded that the first sale, at 8.04 percent, was most applicable to the subject property.(Id.) That sale occurred on January 31, 2007. (Id. at 17.) Using an eight percent capitalization rate, Sohm concluded an indicated value of $912,000, rounded, under the income approach.(Id. at 21.)
C. Sales Comparison Approach
Montgomery identified two comparable sales and an option. (Ptf's Ex 1 at 4.) The first sale involved a 13,200 square foot warehouse in Veneta, Oregon, about ten miles west of Eugene, in September 2010, for $800,000, adjusted, or $48 per square foot.[2](Id.) The second sale involved a similar, 12,500 square foot warehouse in Creswell, Oregon, in December 2010, for $275,000, or $22.00 per square foot. (Id.) The option was negotiated in late 2010 and involved a 4,900 square foot warehouse in Cottage Grove for $150,000, or $30.00 per square foot. (Id.) Plaintiff did not identify an indicated value under the sales comparison approach.
Sohm identified three comparable sales and one listing. (Def's Ex A at 17.) The first sale involving an older, 7,840 square foot, two-tenant building in Cottage Grove occurred on January 31, 2007, for an adjusted price of $300,000, or $38.27 per square foot. (Id.) The second sale involved a 28,608 square foot warehouse in the same industrial park as the subject that occurred on February 1, 2007, for an adjusted sale price of $1,341,000, or $46.88 per square foot. (Id. at 17-18.) The third sale involved a 19,000 square foot industrial building in *Page 8 
Springfield, Oregon, that occurred on August 13, 2009, for an adjusted sale price of $1,272,000, or $66.95 per square foot. (Id. at 17, 18.) The listing involved a 13,700 square foot property in Eugene, on January 1, 2010, for an adjusted price of $750,000, or $54.74 per square foot. (Id.) Sohm concluded a price per square foot of $47, for a value of $1,010,500 under the sales comparison approach. (Id. at 18.) At trial, Sohm noted that none of the comparable sales identified were great and he does not think much emphasis should be placed on this approach.
Plaintiff requests a real market value of $641,400 for the 2009-10 tax year. Defendant requests a real market value of $1,000,000, for the 2009-10 tax year.
 II. ANALYSIS
The issue before the court is the real market value of the subject property for the 2009-10 tax year. Real market value is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205.[3] The assessment date for the 2009-10 tax year was January 1, 2009. ORS 308.007; ORS 308.210. "When the determination of real market value * * * is an issue before the tax court, the court has jurisdiction to determine the real market value * * * on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.
There are three methods used to determine real market value: the cost approach, the income approach, and the sales comparison or market approach. Allen v. Dept. of Rev. (Allen),17 OTR 248, 252 (2003). All three approaches must be considered, although "it may be that all three approaches cannot be applied" for a particular property. OAR 150-308.205-(A)(2)(a). "[W]hether in any given assessment one approach should be used exclusive of the others or is *Page 9 
preferable to another or to a combination of the approaches is a question of fact to be determined by the court upon the record."Pacific Power Light Co. v. Dept. of Rev.
(Pacific Power), 286 Or 529, 533, 596 P2d 912 (1979). The subject property is an income-producing property, so primary emphasis will be placed on the income approach. Some emphasis will also be placed on the cost approach because the subject property is relatively new and the parties agree that it has not yet achieved stabilized occupancy. Little weight will be placed on the sales comparison approach because, as both parties acknowledged, none of the comparable sales identified are very similar to the subject with respect to the sale date, the market, or the properties involved.
Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." Feves v. Dept. of Revenue, 4 OTR 302, 312 (1971). Plaintiff "must establish by competent evidence what the appropriate value of the property was as of the assessment date in question."Woods v. Dept. of Rev. (Woods), 16 OTR 56, 59 (2002).
A. Cost Approach
"The cost approach is `particularly useful in valuing new or nearly new improvements,' * * * However, the cost approach is less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable."Magno v. Dept. of Rev. (Magno), 19 OTR 51, 55 (2006), citing Appraisal Institute, The Appraisal of Real Estate 63. "`In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." Id. "[A]ctual costs are relevant and often persuasive, but not controlling. That is because the task is to determine market value and, although different contractors may build the same [property] for differing amounts, the *Page 10 
completed [property] may sell for the same amount of money regardless of how much it cost to build." Murray v. Tillamook County Assessor, TC-MD No 090154C, WL 602442 at *2 (Feb 19, 2010).
In Magno, the taxpayer provided "extensive evidence * * * showing the costs she incurred remodeling her property, including financial records prepared by her business partner[.]" Id. at 55. "Most of the work on taxpayer's remodel was performed by her, [her partner], and [company] employees * * *." Id. at 57. The county argued that the "taxpayer's cost estimate [was] unsound" because the "taxpayer did not pay market price for the remodel." Id. at 56. The court noted that the reliability of the taxpayer's evidence was placed in some doubt because the taxpayer's partner testified that he had failed to account for some costs and, as the county pointed out, some other costs "appeared to be missing from taxpayer's cost estimate." Id.
Ultimately, the court concluded that the taxpayer's "cost estimate [was] uncertain and unreliable" based in part on "the close relationship between taxpayer and those who did the work, both in terms of the contractor discounts that taxpayer's company * * * received for materials, and in terms of the uncertain rates which taxpayer * * * paid for labor." Id. at 58.
The court finds that Plaintiff here failed to meet the burden of proof with respect to its indicated value under the cost approach. Plaintiff's reported land cost of $105,000 was as of January 2007, and was not adjusted for time. Plaintiff did not provide detailed cost information or any evidence to support its reported building cost. As inMagno, the court is not persuaded that Plaintiff's reported building costs reflect the market value of the improvements due to the close business relationship between the builder and Plaintiff. The court finds that the indicated value of $1,199,000 concluded by Defendant under the cost approach is reasonable in this case. *Page 11 
B. Income Approach
"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." Allen,17 OTR at 253 (citation omitted). "A basic requirement of the income method is fixing an annual income to capitalize." Pacific Power,286 Or at 540. The Oregon Supreme Court "decided that the flow of income to be determined is that which `would be anticipated by reasonable, knowledgeable buyers and sellers as of the assessment date[.]'"Pacific Power, 286 Or at 541-42, citing Mt. Bachelor v. Dept. ofRev., 273 Or 86, 539 P2d 653 (1975). Both parties here relied on the direct capitalization method to determine expected future income. "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income[.]" Allen, 17 OTR at 253. Net operating income "is the currently expected net income of a property after all operating expenses are deducted from gross income." Id. at 254. "To calculate the [net operating income], appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data."Id. at 254.
The court finds Plaintiff's rent comparables persuasive and accepts Plaintiff's rental rate of $.40 per square foot and potential gross income of $103,200. Defendant used a rate of $.45 per square foot based on a comparable property in Eugene. However, Eugene is a larger market than Cottage Grove and rental properties command higher rates. Neither party provided market data concerning stabilized occupancy as of January 1, 2009. Plaintiff testified that the actual vacancy of the subject property was 45 percent as of January 1, 2009, but used vacancy rates of 20 and 30 percent. Defendant used a vacancy rate of 15 percent. Based on the testimony and evidence presented, the court finds that a vacancy rate of 20 percent is reasonable in this case. *Page 12 
The parties are in agreement with respect to the following expenses: $1,843 for insurance; $1,200 for maintenance; and $3,600 for utilities. The parties also agree that a five percent management fee is reasonable. Sohm testified that several expenses claimed by Plaintiff are ordinarily included in the management fee. The court accepts that explanation with respect to Plaintiff's listed expenses for advertising. However, inclusion of accounting and legal expenses in the management fee would require a fee greater than five percent. Thus, the court finds that Plaintiff's reported accounting and legal expenses of $1,080 are reasonable in this case.
"In a case where the amount of taxes is in dispute, the capitalization rate should include the rate of assessment on the real property."Valley River Ctr. Et Al v. Dept. of Rev., 6 OTR 368, 373 (1976). Both Montgomery and Sohm included property taxes in the expenses for the subject property. The court finds that property taxes should not be included in expenses; rather, the tax rate should be added to the capitalization rate. The court concludes expenses in the amount of $12,000 (rounded) for a net operating income of $70,500 (rounded).
"Deriving capitalization rates from comparable sales is the preferred technique when sufficient data on sales of similar, competitive properties is available. Data on each property's sale price, income, expenses, financing terms, and market conditions at the time of sale is needed." Allen, 17 OTR at 258, citing Appraisal Institute, TheAppraisal of Real Estate 531. Montgomery selected a capitalization rate of nine percent based on sales that occurred nine and twelve months after the January 1, 2009, assessment date. Sohm selected an eight percent capitalization rate based primarily on a sale that occurred two years before the assessment date. The court concludes that a capitalization rate of 9.5 percent, including tax rate, was appropriate as of January 1, 2009, for an indicated value of $740,000, rounded, under the income approach. *Page 13 
C. Sales Comparison Approach
"Under the sales comparison approach, the value of a property is derived by `comparing the subject property with similar properties, called comparable sales.' That comparison is based on many factors, and adjustments are made for any differences between the comparable sales and the subject property so that the appraiser can derive a value for the subject property." Magno, 19 OTR at 58 (citations omitted). Thus, "[t]he court looks for arm's length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value" of the subject property. Richardson v.Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003). Based on the evidence presented by the parties, the court concludes a price per square foot of $44.50 for an indicated value of $950,000, rounded, under the sales comparison approach as of January 1, 2009.
 III. CONCLUSION
The subject property is an income-producing property and primary emphasis is placed on the income approach. After carefully considering the evidence, the court concludes that the real market value of the subject property as of January 1, 2009, was $820,000. Now, therefore,
IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account 1650314 was $820,000 for the 2009-10 tax year.
Dated this ___ day of March 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR. *Page 14 
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Magistrate Pro Tempore Allison R.Boomer on March 30, 2011. The Court filed and entered this documenton March 30, 2011.
[1] Plaintiff's Exhibit 1 includes a typographical error listing the value as $632,0000; Plaintiff testified at trial that value concluded at 20 percent vacancy was $632,000.
[2] Montgomery noted that "Seller converted property with permit for an additional 19,200 SF building. For the purpose of this valuation 38,000 SF of land is allocated for this building at a value of $100,000 which results in an adjusted sale price of $800,000." (Ptf's Ex 1 at 4, n1.)
[3] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2007. *Page 1