IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| PARKS WESTSAC LLC, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 110118N |
| | ) | |
| v. | ) | |
| | ) | |
| LANE COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the real market value (RMV) of commercial property identified as

Account 1043049 (subject property) for the 2010-11 tax year. Trial was held in the Tax

Courtroom, Salem, Oregon on September 22, 2011. Thomas P. Kerr (Kerr) appeared and

testified on behalf of Plaintiff. Claudia Potter (Potter), manager of the subject property, and Joel

Deis (Deis), licensed real estate broker, testified on behalf of Plaintiff. David W. Sohm (Sohm),

Lane County Registered Appraiser 3, appeared and testified on behalf of Defendant. The court

received and admitted without objection Plaintiff's Exhibits 1-13 and Defendant's Exhibit A and

Rebuttal Exhibits A-C. Subsequent to trial, the parties submitted written closing arguments and

the record closed October 14, 2011.

## I. STATEMENT OF FACTS

The 1.15-acre subject property includes a 20,400 square-foot commercial mini storage

facility built in 1977, All-Star Mini Storage. (Def's Ex A at 2; Ptf's Ex 2 at 1-3.) The storage

facility is divided into 188 units, two of which Plaintiff currently utilizes as a manager's office

and for equipment storage.[1] (Ptf's Ex 2 at 3.) The units are partitioned into various sizes as

---

[1] Kerr testified that the manager's office and equipment storage units have been converted from two of the existing 10 by 20-foot storage units. (*See* Ptf's Ex 2 at 3.) As a result of the conversion only 20,000 square-feet of rentable mini-storage space remain available.

follows: 86 units measure 5 by 10-feet; 43 units measure 10 by 10-feet; and 57 units measure 10 by 20-feet.[2] (*Id*.) The storage facility is constructed of metal siding on metal frame. (*Id.* at 1.)

The subject property is located on Main Street in Springfield, Oregon. (Ptf's Ex 2 at 2; Def's Ex A at 2.) Sohm testified that the facility is located in a "high exposure" area of Main Street. Kerr noted some accessibility difficulties presented by a combination of the intersection and the gating system. Both Kerr and Sohm agreed that access to the mini-storage is average. (*See id*.) A mobile home park and small restaurant building immediately abut the subject property to the south and east, with neighborhood commercial shopping located nearby. (*Id*.)

Kerr testified that, as of January 1, 2010, the subject property had neither plumbing nor access to water or sewer; the employees used a portable sanitary facility located outside the converted manager's office. (*See* Ptf's Ex 2 at 3.) Electricity was available only in the office and the facility operated without security cameras or controlled access gates, a fact that Kerr contends significantly lowers the quality of the subject property. (*See id*.) Potter testified that the general condition of the subject property has declined in recent years as access to water from the neighboring restaurant was eliminated in 2009. As a result, maintenance and cleaning have been limited for a significant period of time.

Potter and Kerr also testified that the gutters and thresholds on many of the subject property units needed to be replaced. Photographs of the subject property units demonstrated some dirt and trash accumulating near the roll-up metal doors; Potter testified that the debris tended to sift into the units when the doors became over-stretched and no longer sealed properly. (*See* Ptf's Ex 2 at 11-14.) Careless drivers have damaged the outside corners of the subject property end units and have left them with noticeable cosmetic damage. (*Id.* at 8.) During her

---

[2] The two units reserved for Plaintiff's business use measure 10 by 20-feet.

testimony, Potter detailed staff attempts to clean or repair the units as they became available for lease; largely, those attempts have been unsuccessful and time-consuming. Potter was unable to respond specifically to Sohm's questions regarding access to public utilities or bids to contract out the repair or maintenance work; she described her recollection that the subject property manager in 2009 had looked into the possibility and deemed it too expensive.

A.      *Valuation: Sales Comparison Approach*

Kerr identified four comparable sales, located within a geographic area ranging from Eugene to Medford; Kerr noted these comparable sales were selected based upon "similarities in appeal, location, and quality." (Ptf's Ex 2 at 16-17.) Located on Shelley Street in Springfield and built in 1974, Kerr's first comparable sale (Comp 1) is a 9,150 net rentable square-foot brick[3] facility with 83 units[4] that features a "resident" manager and security cameras. (*Id.* at 17-18.) Comp 1 sold in September 2008, for an unadjusted price of $379,312, or $41.45 per net rentable square foot and $4,570 per unit.[5] (*Id.* at 18.) At trial, Kerr testified that he made a net downward adjustment of 20 percent for Comp 1,[6] for an adjusted price per square foot of $30.15. (*See id.* at 17.)

/ / /

/ / /

---

[3] Kerr described Comp 1 as a "brick" construction, although Defendant specifies that the facility has "brick veneer siding." (Ptf's Ex 2 at 17; Def's Ex A at 7.) Photos of comp 1 reveal buildings with a brick-like appearance, however, the county listing states "wood or steel studs" for the building class. (Ptf's Ex 2 at 18.)

[4] Comp 1 offers a mix of units, with units measuring 5 by 10-feet and 10 by 20-feet the most common unit sizes. (Ptf's Ex 2 at 17-18.)

[5] Defendant states the sale of Comp 1 occurred on March 20, 2008; however, the county sales data sheet indicates a sale date of September 25, 2008. (Def's Ex A at 6; Ptf's Ex 2 at 18.) The gross square feet of Comp 1 is 10,064. (Ptf's Ex 2 at 18.) Kerr's reported price per square foot of $37.69 appears to be based on the gross square feet of Comp 1. (*See id.* at 17, 18.)

[6] Kerr made an upward adjustment of 10 percent for the number of units available at Comp 1; he also made downward adjustments of 15 percent, 10 percent, and five percent for the construction type, the on-site managers, and the security cameras, respectively; in total, a net downward adjustment of 20 percent. (*See* Ptf's Ex 2 at 17.)

Kerr's second comparable sale (Comp 2), "Meadow View," is a 240-unit[7] metal mini-storage located near Junction City that was built in 1982 and contains 24,000 rentable square-feet. (Ptf's Ex 2 at 17, 23.)  "Comp 2" includes on-site management, but not security cameras or other updated security systems. (*Id*.)  Comp 2 sold in December 2008, for $800,000, or $33.33 per square foot and $3,333 per unit. (*Id*. at 23.)  Kerr testified that he made a net five percent downward adjustment for an adjusted price per square foot of $31.66.[8] (*See id*. at 17.)

Kerr's third comparable sale (Comp 3), Alpine, is a 28,314 square-foot metal mini-storage facility containing 57 storage units on 0.83 acres located in McMinnville. (Ptf's Ex 2 at 17, 26-27.)  Comp 3 features an electronic gate system but not security cameras or on-site management. (*Id*.)  Comp 3 sold in April 2009, for $535,000, or $18.90 per square foot and $9,385.97 per unit. (*Id*.)  Kerr made a net upward adjustment of five percent for an adjusted price per square foot of $19.85.[9] (Ptf's Ex 2 at 17.)

Kerr's fourth comparable sale (Comp 4), A-1 Secured, is a 47,065 square-foot facility built in 2007 of cinder block construction, including 252 storage units,[10] that is situated on 2.44 acres in Medford. (Ptf's Ex 2 at 17, 29-30.)  Comp 4 features an on-site manager, security cameras, and an electronic gate. (*Id*.)  The property sold in a short sale in August 2009, for $1,500,000, or $31.87 per square foot and $5,952 per unit. (*Id*.; Def's Rebuttal Ex A.)

---

[7] Units sized 5 by 9-foot, 6 by 10-foot, 6 by 12-foot, and 6 by 14-foot represent the majority of the space. (Ptf's Ex 2 at 17, 23; Def's Ex A at 6-7.)

[8] Plaintiff's total downward adjustment of five percent to Comp 2 includes an upward adjustment of five percent for the number of units and a downward adjustment of 10 percent for the on-site manager.

[9] Kerr's total upward adjustment of five percent for Comp 3 reflects a downward adjustment of five percent for the quality class, a downward adjustment of five percent for the electronic gate system, and an upward adjustment of fifteen percent for the number of units. (Ptf's Ex 2 at 17.)

[10] Kerr states that Comp 4 includes 244 units. (Ptf's Ex 2 at 17.)  Elsewhere, Comp 4 is described as including 252 units with "a total of 8 single-story buildings on site." (*Id*. at 30.)  It is unclear to the court whether Kerr's statement of 244 units is based on the exclusion of the 8 single-story units.

Kerr made a net downward adjustment of 15 percent for an adjusted price per square foot of $27.09.[11] (Ptf's Ex 2 at 17.) Based on his four comparable sales, Kerr determined a value of $31.00 per square foot for a total value of $632,400 under the sales comparison approach. (*Id.*)

Sohm also provided four sales comparables, two of which were identified previously as Kerr's Comp 1 and Comp 2, located in Eugene and Junction City. Sohm testified that he used price per unit, not price per square foot. He has appraised many mini storage facilities and has never seen price per square foot as a unit of comparison. Sohm's comparable sale 1 (Comp 1) is a 70,654 square-foot mini-storage facility built in 1977 with brick veneer located in west Eugene; it includes 534 storage units and on-site management.[12] (Def's Ex A at 6, 13.) Sohm's Comp 1 sold in January 2009, for $6,900,000, including 168,141 square feet of "rocked land used for RV storage." (*Id.*) Sohm determined an adjusted price of $5,882,000 for the Comp 1 storage facility after excluding the value of the additional RV storage, for an adjusted price per unit of $11,015.[13] (*Id.* at 6.) Sohm did not state whether his Comp 1 included security cameras, electronic gates, or other amenities.

Sohm's comparable sale 2 (Comp 2), a two-story concrete block structure built in 1978 and located in west Eugene, is 89,568 square feet and includes 847 units. (Def's Ex A at 6, 14.)

/ / /

/ / /

---

[11] Kerr's downward adjustment reflects a 35 percent upward adjustment for the short sale, and the following downward adjustments: five percent for size, 15 percent for age, 10 percent for a resident manager, and five percent for an electronic gate. (Ptf's Ex 2 at 17.)

[12] Sohm states Comp 1 was built in 1974; Defendant's data sheet states 1977. (Def's Ex A at 6, 13.)

[13] The price per square foot indicated by Sohm's adjusted price for Comp 1 is $83.45. Defendant's sales data sheet lists the price per unit of Sohm's Comp 1 as $8,984 and the price per square-foot of $97.66. (Def's Ex A at 13.) It is unclear whether the data sheet includes the 234 RV storage units that Sohm removed to determine an adjusted sales price. Sohm's reported unadjusted price per unit of $12,921 fails to take into account the 234 RV storage units included in the original sale price. (*Id.* at 6, 13.)

Sohm noted an on-site manager, but not any other amenities. (*Id.*) Sohm's Comp 2 sold for an adjusted[14] sale price of $5,400,000 in January 2009,[15] with a price per unit of $6,375.[16] (*Id.*)

Sohm's comparables 3 and 4 are the same sales identified as Kerr's comparable sales 1 and 2, respectively. Sohm noted that Kerr's Comp 1 on Shelley Street in Springfield "is small [and therefore] less economical to operate and reflects a higher expense ratio, similar to the subject." (Def's Ex A at 7.) Nonetheless, Sohm concluded that Kerr's Comp 1 "reflects a price per unit lower than would be applicable to the subject complex" due to its "age, average unit size, and very small complex size * * *." (*Id.*) In addition, Sohm noted that Kerr's Comp 2 near Junction City is situated in a rural location and:

> "includes few very large spaces and has a high average unit size, but this tends to lower the income per square foot and the price per unit. Because of the location, age, condition, complex size, and unit mix, this property reflects a lower price per unit than would apply to the subject."

(*Id.*) Sohm determined a per-unit price of $5,500 under the sales comparison approach, for a total value of $1,034,000. (*Id.*)

B.      *Valuation: Income Approach*

Both Sohm and Kerr determined potential gross income based on the subject property's actual rent, which reflects market rent. (*See* Ptf's Ex 2 at 33, 38; Def's Ex A at 9.) Sohm determined potential gross income for the subject property was $171,180; that reflects rents for 187 units.[17] (Def's Ex A at 9; Def's Closing Arg at 1.) Kerr determined potential gross income

---

[14] The adjustment is stated on Defendant's data sheet as an upward adjustment of $34,336 for "other." (Def's Ex A at 14.)

[15] Defendant states the sale date as "March 2008," however, Defendant's data sheet notes the sale date as January 21, 2009. (Def's Ex A at 14.)

[16] The price per square foot indicated by Sohm's Comp 2 is $60.29.

[17] Sohm's report states "[t]he subject property is judged to command potential gross income of $171,180 per year at market rents as of January 1, 2009." (Def's Ex A at 9.) It is unclear to the court whether Sohm's reference to January 1, 2009, was a typographical error that should have stated January 1, 2010.

of $168,960, which is less than Sohm's determination because Kerr excluded the unit used as a maintenance storage area for tools and other supplies. (Ptf's Closing Arg at 4.) According to the income and expense statements provided by Plaintiff, the subject property's income also includes "Late & Returned Check Fees" and "Misc. Income." (Ptf's Ex 2 at 33, 38.) The total of those figures was $5,850 in 2007, $4,415 in 2008, and $5,660 in 2009. (*Id.* at 33.) Kerr's 2010 Pro Forma includes "Late Fees & other" of $4,500. (*Id.* at 38.)

Sohm stated that the subject property "was established in the market at the date of value and had reached stabilized occupancy." (Def's Ex A at 10.) He further noted that, according to responses provided by Plaintiff to Defendant's survey in November 2009, Plaintiff projected an expected vacancy of 15 percent for 2010. (*Id.*) Notwithstanding Plaintiff's projection, Sohm recognized that the "deep recession" impacting the Springfield mini-storage market at the time of valuation resulted in an over-supply of available storage space. (*Id.*) As a result, Sohm concluded the correct "stabilized vacancy factor for the subject property at January 1, 2010 was 20%[, indicating] a vacancy allowance of $34,236." (*Id.*) Sohm later clarified that the "vacancy allowance" included collection losses, resulting in a total effective gross income of $136,944. (Def's Closing Arg at 3; Def's Ex A at 10.) Kerr accepts the 20 percent vacancy loss Sohm proposed but stated that an "additional collection loss of 3%[]" should also be applied. (Ptf's Closing Arg at 4.) Sohm stated that the vacancy and collection loss allowances are "typically reflected as a single percentage factor[,]" for which Sohm suggested 20 percent is reasonable given Plaintiff's November 2009 survey response projecting a 15 percent anticipated vacancy for 2010. (Def's Closing Arg at 3; *see also* Def's Ex A at 10.)

Kerr and Sohm differed in their approaches to calculating appropriate operating expenses. Kerr relied on the subject property's actual expenses over the prior three years, stating that a

knowledgeable buyer would only consider actual expenses. According to Kerr, the subject property's total expenses for 2007, 2008, and 2009 were $65,149, $69,908, and $70,295, respectively. (Ptf's Ex 2 at 34.) Kerr testified that considering the actual expenses incurred by the subject property over prior years offers the only correct method of calculating expenses. (*See* Ptf's Closing Arg at 4,7.) More specifically, Kerr stated that a knowledgeable buyer would examine the prior three years of operating expenses. (*Id*.) Dies testified in support of Kerr's position. (*See* Ptf's Closing Arg at 7.) Kerr provided the subject property's operating expenses from 2003 through 2009, including wages, payroll taxes, worker's compensation insurance, bookkeeping expenses, maintenance, utilities, insurance, advertising, bank fees, and a number of other miscellaneous expenses. (Ptf's Ex 2 at 34-35.) Kerr projected 2010 total operating expenses of $72,431 (53.8 percent), for net operating income (NOI) of $62,168, not including property taxes. (*Id.* at 38.) Kerr reported NOI, not including property taxes, of $68,659 in 2009, and $84,891 in 2008. (*Id*. at 34.) Sohm noted that Plaintiff's actual expense ratio, including property taxes, would be 63.46 percent. (Def's Closing Arg at 4.)

Sohm dismissed Kerr's "actual dollar" method as an "approach result[ing] in an investment value for the property based upon [its] operating style." (Def's Closing Arg at 4.) Sohm contends that "[r]ather than investment value, the court is seeking real market value * * * [which] assumes typical market management and typical market expenses." (*Id*.) Although Sohm conceded that property taxes are a "major expense[,]" he explained that "[e]liminating property taxes from the expense ratio and allocating property tax expense based on the effective tax rate is the method required by the Oregon Department of Revenue." (Def's Ex A at 10.)

Sohm determined an overall expense ratio, excluding property taxes, of 40.5 percent, or $55,491, for the subject property as of January 1, 2010, based upon data received through a 2009

survey of similar properties. (Ptf's Closing Arg at 9; Def's Closing Arg at 4; Def's Ex A at 10.)

He calculated NOI of $81,453 for the subject property. (Def's Ex A at 10.) Sohm testified that

an appropriate overall expense ratio should not exceed 50 percent, including 25 percent for

management expenses and property taxes. (*See* Def's Ex A at 10.)

At trial, Kerr cross-examined Sohm on Defendant's 2009 survey. Sohm stated that

survey participants were not required to note if responses included property taxes, nor were they

prompted to state whether management expenses included payroll taxes, non-wage compensation

such as on-site management rent, or workers' compensation and health insurance costs. (*See*

Ptf's Closing Arg at 6.) Kerr submitted an affidavit from Kevin Howard (Howard), "a prominent

regional mini-warehouse owner and manager," stating that the economic decline and

corresponding stagnation in the mini-storage industry created a situation in which "income ha[d]

gone down [but] expenses ha[d] not gone down proportionally[,]" which caused "operating

expense ratios [to] rise[] significantly." (Ptf's Ex 2 at 40, 41; Def's Ex A at 10.) Howard noted

that "many expenses remain fixed or increase, as is the case with hourly minimum wage rates

and properties." (Ptf's Ex 2 at 41.) Howard suggested an operating expense ratio for larger

facilities of 37 percent in 2009 , 39 percent in 2010, and "41.3 % as of June 30, 2010 as an

average for all facilities[;]" he noted an additional 8-10 percent for "facilities of 150-225 units

without resident on-site managers[.]" (*Id.*) Kerr noted that, with Howard's numbers, the

appropriate expense ratio for the subject property would be 45 to 47 percent. (Ptf's Closing Arg

at 5.) It is unclear whether the expense ratios stated by Howard or Kerr included property taxes.

In his closing argument, Sohm favorably cited the operating expense range of 45 to 49

percent proposed by Howard, noting that a figure in the middle of the range, 47 percent, would

be appropriate for the subject property. (Def's Closing Arg at 4; Def's Ex A at 10.) Using a rate

of 47 percent, Sohm calculated "operating expenses of $64,364 and an after tax [NOI] of $72,580." (Def's Closing Arg at 4.)

Both Kerr and Sohm utilized the sales identified in their sales comparison approaches to determine capitalization rates; both noted a lack of optimal comparable sales within the relevant market and geographic area. Kerr's Comps 1, 2, and 4 indicated rates ranging from 6.12 to 10 percent. (Ptf's Ex 2 at 47.) However, Kerr cited Sohm's conclusion in *Lane County Assessor v. Airport Budget Storage LLC* that use of other comparable sales from which to derive an appropriate capitalization rate is "most reliable when sales are comparable and current." (Ptf's Closing Arg at 10 citing *Lane County Assessor v. Airport Budget Storage LLC*, TC-MD 030665D at 5.) According to Kerr, there are no sales reasonably current enough to the valuation date to be truly reliable for purposes of selecting a capitalization rate. (Ptf's Closing Arg at 10-11.) Instead, Kerr suggested that the expert testimony of Howard and Deis supports the position that an informed buyer in January 2010, would require a capitalization rate in the range of 9.5 to 10 percent. (*Id.*) In his affidavit, Howard stated that an informed buyer "would not pay less than a capitalization rate of 9% to 9.5%." (Ptf's Ex 2 at 42.) Moreover, Howard indicated that, for an older and smaller investment like the subject property, a reasonable buyer would add "at least another 0.5%" to that capitalization rate. (*Id* at 43.) Deis testified that a capitalization rate of 9 to 10 percent was not uncommon as of January 1, 2010.

Sohm's four comparable sales yielded capitalization rates of 6.12 to 7.93 percent. (Def's Ex A at 11.) Because of the elevated risk in the marketplace at the time of valuation, Sohm gave the most weight to his Comp 2 and Comp 4, with capitalization rates of 7.93 and 7.70 percent, respectively. (*Id.*) Sohm concluded a capitalization rate of 7.5 percent for the subject property.[18]

---

[18] Sohm concluded a capitalization rate of "January 1, 2009[,]" which appears to be a typographical error given that the valuation date is January 1, 2010. (Def's Ex A at 11.)

(*Id.*) Sohm added a tax rate of 0.927 percent for an overall rate of 8.43 percent. (*Id.*) Sohm

provided as rebuttal a September 2009, sale of a 107 unit mini storage facility in Central Point,

Oregon, with a capitalization rate of 8.10 percent "At Time Of Listing," and a June 2008, sale of

a 180 unit mini storage facility in Riddle, Oregon, with a capitalization rate of 7.50 percent "At

Time of Listing." (Def's Rebuttal Ex B, C.) In his closing arguments, Sohm stated an overall

rate of 7.75 percent, explaining that "[t]he higher overall rate indication is from the 107 unit

complex of Rebuttal Exhibit B at 8.6% that is smaller than the subject and located in [Central

Point], Oregon, clearly an inferior location to the subject." (Defs Closing Arg at 5.)

Plaintiff requests that the 2010-11 RMV of the subject property be reduced to $527,300.

Defendant requests that the 2010-11 roll RMV be reduced to $1,000,000. (Defs Closing Arg at

5.) The 2010-11 maximum assessed value of the subject property is $754,828.

## II.  ANALYSIS

The issue before the court is the RMV of the subject property for the 2010-11 tax year.

"Real market value is the standard used throughout the ad valorem statutes except for special

assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D,

WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)).

RMV is "the value based on market worth rather than investment expectation or insurance

value." *Chart Development Corp v. Dept. of Rev.*, 16 OTR 9, 12 (2001) (specifying the unique

elements of RMV) (citations omitted). RMV is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash
> that could reasonably be expected to be paid by an informed buyer to an informed
> seller, each acting without compulsion in an arm's length transaction occurring as
> of the assessment date for the tax year."[19]

---

[19] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are
to 2009.

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]" ORS 308.205(2). There are three methods of valuation that are used to determine RMV: the cost approach, the sales comparison approach, and the income approach. *Allen v. Dept. of Rev.*, 17 OTR 248,252 (2003). Although each approach must be considered, all three approaches may not be applicable to the valuation of the subject property. OAR 150-308.205-(A)(2)(a). The determination of which method is the most appropriate for the subject property is a question of fact. *See Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979) (stating the selection of method or methods in any particular appeal is a question of fact for the court). Both parties determined, and the court agrees, that the cost approach to value is not applicable in this case due to the age of the subject property. (*See* Ptf's Ex 2 at 15; Ptf's Closing Arg at 1.) Kerr and Sohm both stated, and the court agrees, that the income approach is the more appropriate method of valuation for the subject property, an income-producing property.

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971); *see also Wood v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (stating that the plaintiff "must establish by competent evidence * * * the appropriate value of the property * * *"). In determining the RMV, the court is not constrained by the values pleaded by the parties, but must, instead, "determine the real market value * * * on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

/ / /

A.    *Sales Comparison Approach*

Under the sales comparison approach, the subject property's value is determined based on sales of properties similar to the subject property that are recent with respect to the date of valuation. "The sales comparison approach is most useful when a number of similar properties have recently been sold * * * in the subject property's market." *Magno v. Dept. of Rev.*, 19 OTR 51, 58-59 (2006) (quoting Appraisal Institute, *The Appraisal of Real Estate* 63 (12th ed 2001) (emphasis omitted)). Thus, "the court looks for arm's-length sale transactions of property similar in size, quality, age and location * * * in order to determine the [real market value]" of the subject property. *Richardson*, WL 21263620 at *3. Adjustments must be made for differences, including location, age, condition, size, and amenities. *See* OAR 150-308.205-(A)(2)(c) (stating that "only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used"). However, sales requiring excessive adjustments may not be comparable to the subject property.

Kerr made percentage adjustments to each of his comparable sales, but provided no support for his adjustments other than his own experience as an owner of mini-storage properties. On cross-examination, Kerr stated that he did not have a particular logic for each adjustment, but relied on experience to dictate the numbers selected. Generally, the "taxpayer not relying on an expert appraisal must offer something beyond his own testimony and theories about the law of property valuation to succeed at trial * * *." *Freitag v. Dept. of Rev.*, 19 OTR 37, 44 (2006). Kerr is not an appraisal expert, despite his experience as a property owner and manager. The court finds that Kerr's adjustments are due little weight because they are not supported by appraisal expertise and it is unclear how they were derived. Sohm made

"qualitative" rather than "quantitative" adjustments, due to his determination that "there [was] insufficient data to extract reliable quantitative adjustments." (Def's Ex A at 6.)

Kerr and Sohm both noted difficulties in finding good comparable sales due to the scant number of mini-storage sales in the relevant geographic area near January 1, 2010. Nevertheless, each identified four comparables sales with two in common; Kerr's Comp 1 and Comp 2 were also utilized by Sohm's as his Comp 3 and Comp 4, respectively. Kerr's Comp 1/Sohm's Comp 3, located in Springfield, sold for $379,321 in September 2008, or $41.45 per square foot and $4,570 per unit. Kerr's Comp 1/Sohm's Comp 3 is similar to the subject property in age, location, class, and unit size; however, it includes an on-site manager and only 83 units as compared with the subject property 186 units. Kerr's Comp 2/Sohm's Comp 4 is located outside of Junction City and sold for $800,000 in December 2008, or $33.33 per square foot and $3,333 per unit. It was built in 1982 (four years after the subject property), offers on-site management, and is larger than the subject property with respect to property size and number of units.[20]

The court gives the most weight to Kerr's Comp 1/Sohm's Comp 3 and Kerr's Comp 2/Sohm's Comp 4. The other sales identified are less comparable to the subject property. For instance, Kerr's Comps 3 and 4 are both located outside of Lane County and far from the subject property. Sohm's Comps 1 and 2 are significantly larger than the subject property, with 534 and 847 units, respectively; his Comp 1 included RV storage space and billboards. Based on the evidence presented, the court finds the indicated price per unit to be $3,750, for an RMV of $697,500 for the subject property under the sales comparison approach as of January 1, 2010.

/ / /

/ / /

---

[20] Kerr's Comp 2/Sohm's Comp 4 also offers a larger variety of unit mix than the subject property.

B.      *Income Approach*

The income approach "relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income it [will] produce[]." *Allen*, 17 OTR at 253 (citation omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income[.]" *Id.*

> "NOI is the currently expected net income of a property after all operating expenses are deducted from gross income. To calculate the NOI, appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data. In the direct capitalization methodology, unlike a discounted cash flow or yield methodology, future NOI is not projected or estimated."

*Id.* at 254 (citations omitted). The court seeks to ascertain the income that "would be anticipated by reasonable, knowledgeable buyers and sellers as of the assessment date." *Mt. Bachelor v. Dept. of Rev.*, 273 Or 86, 92, 539 P2d 653 (1975).

Kerr and Sohm agree that the actual rents for the subject property are market rents and should be used to determine potential gross income. Their only disagreement with respect to potential gross income is based on Sohm's inclusion of a unit used for business-related supplies and equipment and the miscalculation of one unit's size. After examining the information provided by the parties, the court agrees with Plaintiff and finds that the potential gross rental income for the subject property as of January 1, 2010, was $168,960. Based on the subject property's actual income, the court finds other income of $5,300 as of January 1, 2010.

Kerr and Sohm both agree that market vacancy was 20 percent as of January 1, 2010. Kerr, however, disagreed that the 20 vacancy reflected credit loss and three percent should be included to appropriately reflect the Eugene/Springfield mini-storage market as of January 1, 2010. Dies also testified that the subject property's market was well over the saturation point for mini-storage facilities on January 1, 2010. According to Dies, a vacancy level of 35 to 40

percent was typical for the Springfield at the time of valuation. The affidavit of Howard stated that, as a result of market changes, "good, solid occupancy [will] be 78% to 80%" in the future, suggesting vacancy of 20 to 22 percent. (Ptf's Ex 2 at 44.) Sohm noted that Plaintiff's response to Defendant's November 2009, survey indicated a projected vacancy rate of only 15 percent. The court finds that the evidence supports vacancy and credit loss of 23 percent for the subject property, for effective gross income of $134,200, rounded, as of January 1, 2010.

Kerr and Sohm differ significantly regarding their approach to determining expenses. Kerr contends that operating expenses should be determined using the subject property's actual expenses for the prior year; according to Kerr, that is the information that an actual buyer would require and would rely upon when determining whether to purchase the subject property. In addition, Kerr thinks property taxes should be included as an expense when calculating NOI. Sohm determined expenses based on expense ratios reported in Defendant's November 2009, survey, and other market evidence, noting that a well-managed property similar to the subject property should have an expense ratio that does not exceed 50 percent. (Def's Ex A at 10.) Sohm stated that, although "[p]roperty taxes are a major expense[,]" property taxes should be reflected by "increasing the overall capitalization rate by the effective property tax rate." (*Id.*)

The subject property's actual expense ratio at the time of valuation was 53.8 percent, not including property taxes. Kerr testified that many expenses are fixed and cannot be reduced, even when rents decline, including minimum wages (thus, payroll expenses), city water utility fees, portable toilet fees, and others. Kerr noted that Defendant's expense ratios from surveyed properties are inconsistent. Sohm admitted during cross-examination that he did not know whether reported expense ratios included property taxes, on-site management rent, or a number of other expenses. The court agrees that the information about Defendant's November 2009

DECISION  TC-MD 110118N                                                          16

survey is insufficient to determine the applicability of expenses reported by the survey. In the affidavit provided by Plaintiff, Howard, who is regarded as an expert by both Kerr and Sohm, reported expenses ranging from 45 to 49 percent as of January 1, 2010.

Kerr and Sohm also disagree whether property taxes should be included as an expense. This court has stated a preference for adding the tax rate to the capitalization rate for an overall rate. "In a case where the amount of taxes is in dispute, the capitalization rate should include the rate of assessment on the real property." *Valley River Ctr v. Dept of Rev.*, 6 OTR 368, 373 (1976); *see also Castle Storage LLC v. Lane County Assessor*, TC-MD 070307 (June 18, 2008) (stating "the better appraisal technique places the tax rate in the capitalization rate instead of as a direct expense.") Based on the evidence presented by the parties, the court finds reasonable expenses for the subject property, not including property taxes, to be 49 percent, for NOI of $68,400, rounded, as of January 1, 2010.

The parties also disagree as to the correct capitalization rate. Capitalization rates based on comparable sales are preferred and are most reliable when "sufficient data on sales of similar, competitive properties is available." *Lane County Assessor v. Airport Budget Storage, LLC*, TC-MD 030665D (March 14, 2004) (citations omitted); *see Allen* at 258 (citations omitted). Both Kerr and Sohm stated that the available comparable sales were limited and not ideal for the subject property. Plaintiff's witnesses testified that a prudent and informed buyer at the time of valuation would not purchase the property with a capitalization rate below 9.5 or 10 percent.[21] In his report, Sohm concluded a capitalization rate of 7.5 percent based on his comparable sales, three of which occurred in 2008 and one in January 2009. He added a tax rate of 0.927 for an overall rate of 8.43 percent. In his closing arguments, Sohm stated that an overall rate of 7.75

---

[21] It is unclear to the court whether the capitalization rates reported by Howard include property taxes.

percent was reasonable. (Def's Closing Arg at 5.) The court finds that an overall rate of 9.5 percent was applicable as of January 1, 2010, for an indicated value of $720,000 for the subject property under the income approach.

### III. CONCLUSION

The subject property is an income-producing property. Accordingly, the income approach is given the most weight in this analysis. After carefully considering the testimony and evidence presented, the court concludes that the subject property's real market value for tax year 2010-11 was $710,000. Now, therefore,

IT IS DECIDED that the real market value of property identified as Account 1043049 was $710,000 for the 2010-11 tax year

Dated this ____ day of March 2012.

_____
ALLISON R. BOOMER
MAGISTRATE PRO TEMPORE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Pro Tempore Allison R. Boomer on March 9, 2012. The Court filed and entered this document on March 9, 2012.*