VALLEY RIVER CENTER, an Oregon general partnership, the sole and only members of which are W. H. SHIELDS, H. A. ANDERSEN, JOSEPH FOUGHT, EUGENE H. SILKE and ALLAN PENNEY; K. C. PROPERTIES, an Oregon general partnership, the sole and only members of which are CARLTON WOODARD, JOY WOODARD, KIM C. WOODARD, KRISTEN A. WOODARD and KIM C. WOODARD as Trustee for TODD C. WOODARD; JOHN D. McBURNEY; GRANT LOVEGREN, individually and as Trustee; and McKEN PROPERTIES, an Oregon general partnership, the sole and only members of which are EDWARD H. WOOD, ROBERT E. HIRT, DARRELL D. DWYER and JAMES DONAHUE, co-partners doing business as VALLEY RIVER INN v. DEPARTMENT OF REVENUE

Vernon D. Gleaves, Butler, Husk & Gleaves, Eugene, represented plaintiffs.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered April 14, 1976.

CARLISLE B. ROBERTS, Judge.

The issue before the court is the true cash value on January 1, 1974, of the Valley River Inn, a motor hotel and convention facility in Lane County. The Department of Revenue, in its Order No. VL 75-287, dated May 16, 1975, determined that the value of the 7.38 acres of land upon which the facility is located was $561,810 and that the value of the improvements was $3,202,150. The plaintiffs agree with the defendant as to land values but pleaded that the improvements should be valued at $1,418,190, a reduction of $1,783,960.

The Valley River Inn, described in its brochures as "a new luxury motor hotel" and convention facility, is located adjacent to the Valley River Center, a re-

gional shopping center in the northwestern area of Eugene, Oregon. It is identified in plaintiffs' complaint as Tax Lot No. 1003 on Lane County Assessor's Map 17-03-30-2, Code Area 4-00, Assessor's Account No. 1049434; and Code Area 4-04, Assessor's Account No. 1049442.

The inn was intended to be completed in two phases. The first phase was completed just 98 days prior to the assessment date. It included the lobby area, meeting rooms, restaurant, bars and other supporting facilities, designed to support, eventually, a 300-unit hotel. However, to reduce risk and because of financial constraints, only 149 guest rooms were planned for the first phase. The planned second phase would encompass the construction of an additional 151 rooms.

It is therefore apparent that there was an imbalance on the assessment date between the number of rooms and the supporting facilities that would not be found in established, competing facilities. The plaintiffs have spent thousands of dollars in this planned imbalance of central improvements to rooms and one of the basic premises of their case is that these over-improvements as of the assessment date constituted a poor investment. They argued that the market would discount the value of the facility because of these allegedly uneconomic overimprovements.

As in all valuation cases, the three basic approaches to value, the market, income, and cost approaches, must be considered. The parties agreed that there were no sales of comparable facilities in the Eugene-Springfield area to enable them to use the favored market approach. *Portland Canning Co. v. Tax Com.*, 241 Or 109, 113, 404 P2d 236, 238 (1965). From this point on, the parties differed as to the next best approach to value. The plaintiffs relied

primarily on the income approach and the defendant relied exclusively on the cost approach.

■ In general, the income approach is an extremely useful tool with which to ascertain the market value of a given piece of income-producing property. The approach involves the discounting of future income of the property to arrive at its present value. If the future earnings are expected to be stabilized, then the present value of this stream of income can be capitalized to arrive at the value of the property.

■ While the income approach is theoretically very appealing, a convincing presentation of testimony in its support is fraught with difficulty. *Feves v. Dept. of Revenue,* 4 OTR 302 (1971). The two components of the income approach, the expected income stream and the capitalization rate, must be separately scrutinized. Both factors can be easily manipulated by the parties involved. Slight variations of a percent or two may result in huge swings in the final result. Reliable, demonstrable data from competing operations in the area are indispensable, but often difficult to obtain.

■■ The first factor, the expected income, is certainly a difficult figure to arrive at under any circumstances. For a motel that has just been constructed, the difficulties are multiplied. To arrive at expected future income, most experts require a period of three to five years, and preferably more, of income experience, adjusted to reflect reasonably anticipated future changes in the marketplace. *Nepom v. Dept. of Revenue,* 4 OTR 531, 533 (1971); Harris, Kerr, Forster & Company, *Economic Factors and Case Studies in Hotel and Motel Evaluation* 28 (2d ed 1968);[1] *Encyclopedia of Real Estate Appraising* 642

---

[1] This edition, originally copyrighted in 1968, again in 1974, contains compiled data through 1966.

(Friedman ed, rev & enlarged ed 1968). The lack of three to five years of operating experience will not always be fatal. If the income experience of truly comparable properties is presented, a strong income approach may be based thereon. *Multnomah County v. Dept. of Rev.,* 4 OTR 383, 395 (1971).

The second component to the income approach is the capitalization rate to be used by the appraiser. Even a slight variation in the capitalization rate can radically affect the ultimate outcome in a given case. (See the example quoted in *Feves, supra,* at 304-305.) Theoreticians break up the overall rate into a number of components. Since most investments are financed by some borrowing, the percent of borrowed capital and the percent of equity capital, and the various returns demanded by lenders and equity owners are analyzed. The capitalization rate should also include a factor for the recovery of the owner's investment. This factor requires an evaluation of the depreciation expected for the improvements and the personal property. In a case where the amount of taxes is in dispute, the capitalization rate should include the rate of assessment on the real property. Otherwise, expected income would vary by expected taxes, and the expected ad valorem taxes are the essence of the dispute. I Bonbright, *Valuation of Property* 257 (1937).

The plaintiffs presented two experienced appraisers who utilized the income approach. The first witness was Wolfgang O. Rood, a partner in the international accounting firm of Harris, Kerr, Forster & Company. The American Institute of Real Estate Appraisers of the National Association of Real Estate Boards has recognized Harris, Kerr, Forster & Company as an authority in the hotel, motel, club, restaurant, hospital, institutional, and real estate fields,

with extensive experience in hotel and motel evaluation.

In valuing the property, Mr. Rood estimated the property's income, before depreciation and income taxes, as $390,000. He then capitalized the income at approximately 14 percent, arriving at an estimated total value for the facility of $2,730,000. By allocating this figure on the basis of the original cost of land, improvements and personalty, Mr. Rood determined a building value of $1,900,000. (An alternative approach would be to subtract from the total estimate of value of $2,730,000 the accepted land value of $561,810 and the assessed value of the personal property of $688,014, to arrive at an estimate of value for the improvements of $1,480,176.)

The second appraiser proffered by the plaintiffs was Mr. Richard M. Stewart. He is the manager of ad valorem tax services for General Appraisal Company, a Portland appraisal firm, and has 30 years of appraisal experience. Without as much detail as used by Mr. Rood, he estimated the income for the property to be $460,000 per year. This was arrived at by adding 10 percent to the first year's profit (before property taxes, depreciation and interest expenses). This figure was capitalized to arrive at a total value of $2,667,160. The appraisal does not isolate the value of the improvements. However, subtracting the admitted land value, $561,810, along with the personal property that was assessed at $671,880,[2] the court assumes that Mr. Stewart would have arrived at a value for the improvements of $1,433,470.

 The court places little reliance on the two different estimated net incomes produced by Mr.

---

[2] While the Rood appraisal used $688,014 as the appraised value of the personal property, the Stewart appraisal used $671,880. No testimony was submitted to explain the different figures or to suggest which figure is correct.

Rood and Mr. Stewart. Mr. Rood's estimated income of $390,000 was based on generalized figures from the entire industry. (See Pl Exs 22 and 24.) Although several of the parties and witnesses to this suit have, for many years, owned and operated a comparable luxury motel, the Village Green at Cottage Grove, 23 miles south of the subject property, they did not provide figures on the income and expenses from this facility. A situation of "less satisfactory evidence" was presented: The figure arrived at was based on *estimates* of occupancy rate and motel prices, estimates that could not be verified in any way before this court. In addition, the expenses were deduced from industry ratios of income to expenses taken from tables based on data derived from hundreds of motels around the country. Finally, Mr. Rood estimated the property tax expenses and deducted them to arrive at his estimate of income. As was explained earlier, the taxes should have been incorporated into the capitalization rate.

Although masses of valuation data are not without their uses, they do not have the testimonial impact of data derived from the subject property and competing properties in the area (as this court has hitherto intimated in *Astoria Plywood Corp. v. Dept. of Rev.*, 6 OTR 57 (1975); *Starker v. Dept. of Rev.*, 6 OTR 10 (1975); *Westbrook et al v. Dept. of Rev.*, 5 OTR 590 (1974)).

The $460,000 figure arrived at by Mr. Stewart was largely unsubstantiated. It was based on income received after the assessment date that could not have been known to a willing buyer or a willing seller on the assessment date. The basis for making a 10 percent adjustment to this figure was not explained. And, finally, the use of historical income as a basis for predicting future earnings, without a 3-to-5-year

income base, cannot produce the trustworthy results upon which this court should be asked to rely.

 Both of plaintiffs' appraisers assumed that the motel would not expand at any time in the future from its then 149 rooms, even though there were central facilities to accommodate 300 guest rooms.[9] The effect was to give the central facilities only a nominal value. However, it is obvious that the market would value more highly a 149-room facility with support facilities for 300 rooms than it would a similar 149-room facility with support facilities for only 149 rooms. It would have been a difficult task to estimate exactly when expansion would be feasible, and the expected risk may have merited a high discount rate, but it was clearly error not to have undertaken the task. The planned overimprovements were not accorded the value which they logically deserved.

The capitalization rate employed by the witnesses also must be scrutinized. The rate chosen by Mr. Rood was approximately 14 percent. (Actually, the witness used a times-earning factor of 7 which equals approximately a 14 percent capitalization rate.) The basis for this capitalization rate was a study prepared by Harris, Kerr, Forster & Company entitled *Economic Factors and Case Studies in Hotel and Motel Valuation, supra,* at 16. This source recommends a factor of between 7 and 8, generally using 8 for newer facilities. The 7 to 8 factor was based on the examination of the relation of profit to selling price of many properties that have been sold in the past.

The study cited may provide broad guidelines for valuing properties, but it lacks the precision needed to value accurately a particular piece of property at a

---

[9] As a matter of fact, the additional rooms were completed shortly before trial of this suit, February 27, 1976. No evidence was adduced to show that the witnesses could have expected this development as of the assessment date, January 1, 1974.

particular time. The Harris, Kerr study was based on the 1966 capital market (more than eight years before the assessment date here involved). No separate consideration was made of changing interest rates or changes demanded by owners for a return on their equity. It does not consider the specific mix of improvements, land and personal property comprising the subject property. Nor does it reflect the specific projected life of the improvements and personal property. The mix of capital and equity financing is not disclosed. All these factors are necessary to fit broad averages to a specific project for any given point in time. *See generally, Encyclopedia of Real Estate Appraising* 41-46 (Friedman ed, rev & enlarged ed 1968).

Mr. Stewart did not use an overall capitalization rate, but built up from the return of capital required from lenders and from plaintiffs' equity and the recovery rate of capital (depreciation) on the individual components of the property. His work on the capital rate was well documented and logical.

The other major approach used to estimate the value of subject property was the cost approach, relied on by the defendant and used by Mr. Stewart as a secondary approach. This approach is based on the theory of substitution: an individual can logically be expected not to build an item for x dollars if the item could be purchased for x—y dollars. The cost approach is generally used for buildings under construction or for structures so recently built that no income history is yet available and where no comparable sales can be found.

To a degree, the cost approach can be looked at as just one more sale. The price which the present owner has paid for the land and to construct the improvements can be said to represent an actual

sale and purchase of the property and should be accorded the same deference as any other recent sale of like property. I Bonbright, *Valuation of Property* 144 (1937). In Oregon, one sale has been approved by the Supreme Court as a conclusive indicator of value. *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 521 P2d 324 (1974); *Kem v. Dept. of Rev.*, 267 Or 111, 514 P2d 1335 (1973).

This court has noted that there are limitations to the use of the cost approach. In *Multnomah County, supra,* at 389-390, it cited with approval *Encyclopedia of Real Estate Appraising* 67 (Friedman ed, rev & enlarged ed 1968):

> " 'An estimate obtained by the Cost Approach may not reflect entirely the prevailing economic or market conditions. The cost of an improvement cannot be recovered in the market if there is no need for the improvement, if the property is not put to its highest and best use, if the structure is *an overimprovement* or of poor design, or if rentals are reduced due to *economic conditions.*' " (Emphasis supplied.)

Mr. Stewart's appraisal included the cost approach as a secondary method of valuation. From the total cost of the property of $4,435,850, he deducted a factor for functional obsolescence of $1,860,322, and reached a property value of $2,575,000 (rounded). From this figure, the land and personal property would have to be deducted to arrive at an estimate of value for the improvements. To arrive at the functional obsolescence figure of $1,860,322, the witness determined that by 1980 the facility could expand its operations by approximately 50 units. However, this would place room revenues at 30.7 percent of total revenues while the national average is 56 percent. At 56 percent, $490,850 of net income in excess of the 30.7 percent would be produced. This was discounted for five years at 10 percent to arrive at $1,860,322.

The witness was unsuccessful in explaining to the court the logic of the method he used to arrive at his measure of obsolescence. The court has found no reference to a similar practice in the appraisal treatises. The witness' estimates of revenue were not documented in any way. Little reliance is therefore placed on this approach.

The Department of Revenue's sole witness was Mr. Robert J. Hughey, the chief assessor for the Lane County Department of Assessment and Taxation. He is a certified appraiser and has had 14 years of experience with the county. He relied exclusively on the cost approach to value. It was uncontested that the parties had spent $3,202,150 on the construction of the Valley River Inn. Since the facility had been in operation for only 98 days on the assessment day, January 1, 1974, no deduction for depreciation was made and there was no trending of cost figures for time. The final estimate of value by Mr. Hughey was $3,202,150.

Although not specifically enumerated, the plaintiffs appeared to present three main objections to the defendant's use of the cost approach. They first seemed to argue that certain costs in the $3,202,150 figure should not have been included. Introduced into the record was the fact that $80,000 to $100,000 was required to be spent for a tunnel under the motel to protect an established water main owned by the Eugene Water and Electric Board. The court believes that this cost should be allocated to the land as site preparation; however, if these moneys have been included in the improvement costs of $3,202,150, they should be deducted therefrom because they do not add to the economic value of the building. Plaintiffs also introduced into evidence a schedule of cost overruns that were incurred during construction, apparently on the theory that they should also be deducted. How-

ever, all of these cost overruns appear to add to the economic value of the building and should properly be included in a cost approach.

The second objection of plaintiffs to the cost approach is that it was not adjusted to reflect an expected lessened demand in the area for first-class motel facilities. The plaintiffs sought to show that, because of planned new hotel-motel facilities in the Eugene-Springfield area, there would be an oversupply of such facilities, resulting in decreasing occupancy rates and lowered profits. The evidence presented by the plaintiffs, mainly through Mr. Rood, indicated that in December 1973 there were approximately 1,850 guest rooms in the area, of which 940 were in primary competition with the Valley River Inn. As of the assessment date, an additional 550 rooms were either under construction or in the planning stage. Mr. Rood therefore concluded that "[p]lanned facilities in 1973 would increase room supply in the area by 75 percent within one year, resulting in at least temporary oversupply of first class room accommodations in the Eugene area."

The court is not particularly swayed by the evidence of "oversupply" presented by plaintiffs. First of all, the fact that a new facility has been announced does not in any way assure that it will ever be completed. Financing, zoning, and other hurdles must be overcome. The court is thus dubious that all 550 of the announced units could realistically be expected to be completed. At least one of the added facilities, a 135-room expansion of the Riverside Thunderbird, had been announced before the subject facility was in its planning stage and was indicated in feasibility studies prepared for the plaintiffs. In addition, such information cuts both ways. The fact that a number of major facilities are proposed for the area indicates that others considered the area to be profitable for

the operation of motel facilities and thus would tend to show that the subject property was more valuable on the assessment date. If others were considering building new facilities, then expansion of the subject may not have been imprudent. Plaintiffs did not reduce their room rate schedule and apparently were prepared to wait out the difficulties experienced in their first months of operation. The court finds insufficient evidence to warrant adjustment because of expected increases in motel competition in the area.

Plaintiffs' final objection is based on the fact that on January 1, 1974, the motel-hotel industry was in the midst of an energy crisis which had decreased motel usage. The following is taken from Laventhol Krekstein Horwath & Horwath, *Lodging Industry* (42d Annual Report; 1974 ed) at 2:

"For 29 months, beginning in mid-1971 and lasting until December 1973, room occupancy showed a steady and encouraging rise, each month being better than the same month in the previous year. In October 1973, the occupancy was 73 percent for the hotels that contribute to our national trend, the highest point reached since October 1959. Then it happened. The mounting scarcity of gasoline and the uncertain state of business in general, including the outlook for 1974, drove the rate to 46 percent in December, two points below the same month in the previous year. Since then, each month has been below a year ago and the forecast for the balance of 1974 is that there will be little if any improvement in this trend."

Mr. Hughey testified that, as a result of the energy crisis, the Lane County Department of Assessment and Taxation had lowered values for gas stations and certain other facilities relating to the storage and transportation of gasoline products because the market clearly indicated a reduction. The motel industry

did not receive lower assessments even though, obviously, its prosperity is closely related to the use of gasoline. Mr. Hughey testified that the market had not yet clearly indicated to the assessor that a change was required. The evidence did show that subject depended more heavily on conventions, shoppers and business travel than on tourists for its patronage. Since the energy crisis had its greatest impact on tourist travel, it may be concluded that its effect on subject property would not be as severe as it was for the industry in general.

The court concludes that none of the appraisals can be relied on to have produced subject's true cash value on the assessment date. The income approaches were based on highly speculative estimates of income and utilized capitalization rates that were not completely substantiated. In addition, they failed to take into consideration the fact that the facilities had excess capacity on the assessment date, the value of which would be recognized affirmatively in the market. The defendant's use of the cost approach, in the court's estimate, failed to consider sufficiently the effects of the energy crisis on the facility.

The court is thus forced to choose between three more or less inadequate appraisals. (It has been noted that, in the large majority of valuation cases, significant errors probably occur that do a substantial injustice to at least one of the litigants. I Bonbright, *Valuation of Property* 134 (1937).) However, the court does not have any special insight that allows it to come up with the "true" value without simply engaging in compromising the various appraisals. In valuing a new assessment without an income history and where there is no market data, the most dependable approach to value is the cost approach. *Shields et al v. Dept. of Rev.*, 5 OTR 160 (1972), *issue aff'd*, 266 Or 461, 513 P2d 784 (1973). In this case, the

preponderance of the evidence indicates that the cost approach is more likely to be in a range of values called "true cash value," than would be true of the income approach.

The court finds for the defendant and holds that the true cash value of the property on January 1, 1974, was $3,202,150 (less $80,000 to $100,000 attributable to a site handicap, the tunnel for the water main, *if* that sum was included by the county in the assessment roll under the caption of "improvements"). The defendant's Order No. VL 75-287 is affirmed, subject to this mathematical correction, if found applicable.

Each party shall bear his or its costs.