IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| FAIR OAKS APARTMENTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 110469D |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the real market value of property identified as Account R47130 (subject property) for the 2010-11 tax year. Trial was held in this matter on November 9, 2011, in the Mark O. Hatfield Courthouse, Portland, Oregon and by telephone on December 1, 2011. W. Scott Phinney, Attorney at Law, appeared on behalf of Plaintiff. Carly Casal (Casal), Plaintiff's "community manager" since August 2009, and Rick Bean (Bean), licensed real estate broker specializing in commercial real estate and multi-family properties, testified on behalf of Plaintiff. Mark Hertel appeared on behalf of Defendant. Adrienne Frank (Frank), Commercial Appraiser 2, testified on behalf of Defendant. Plaintiff's Exhibits 1 and 2 were offered and received without objection. Defendant objected to Plaintiff's Rebuttal Exhibit 3, Bean's analysis of Defendant's comparable sales based on net operating income (NOI) per unit and per square foot, because it was not timely exchanged. The court admitted Plaintiff's Rebuttal Exhibit 3, finding that it was offered for the purpose of rebuttal. Plaintiff objected to Defendant's Exhibit A, an appraisal of the subject property completed by Frank, arguing that Frank is not qualified as an expert witness because she does not have sufficient training for individual appraisals, only for mass appraisals. Frank responded that she is a "certified registered appraiser" for Defendant. The court allowed the testimony of Frank and admitted Defendant's Exhibit A.

## I. STATEMENT OF FACTS

Casal testified that the subject property is a 12-building apartment complex built in 1998 with 84 units; it also includes 84 carports for tenant parking and four garages for storage. Frank described the buildings as three-story wood-frame construction.[1] (Def's Ex A at 9.) Casal testified that the unit mix is as follows: 24 one bedroom, one bathroom units (733 square feet); 12 two bedroom, one bathroom units (875 square feet); 36 two bedroom, two bathroom units (974 square feet); and 12 three bedroom, two bathroom units (1,160 square feet). (*See* Ptf's Ex 1 at 2-5; Def's Ex A at 1.) Casal testified that the units include washing machines and dryers; there is no laundry facility on site. She testified that the most of the subject property units include original appliances and some units are in need of new paint and new carpets. Casal testified that the subject property is "basic," but maintained. She testified that the only amenities are a "spa" (hot tub) and a clubhouse with a capacity of 15 to 29 people that can be rented for parties; it does not include a pool, sport court, or playground.

Casal testified that the subject property is located on 185th Ave, which is a "main street," but the subject property is "tucked away" so it is not easy to see from the street. She testified that the subject property's address is a Beaverton address, but she considers the area to be Hillsboro/Aloha.[2] Casal testified that the subject property is not located within walking distance[3] of retail stores or restaurants; it is necessary to drive or take the bus. Casal testified the primary competitors of subject property are two apartment complexes located across the street from the

---

[1] Casal testified that the subject property buildings are "vinyl" not wood-frame.

[2] Frank testified that the subject property is located in Aloha, which is a city in between Hillsboro and Beaverton, with its own zip code. (*See* Def's Ex A at 8.)

[3] Casal testified that she considers "walking distance" to be 10 minutes; there is a Safeway grocery store located about one mile from the subject property, but she does not consider that "walking distance." She testified that there is a "Big Lots" and a gas station within a few blocks of the subject property, but no restaurants.

subject property.  She testified that Southeast Beaverton is a more residential neighborhood and is closer to shopping and grocery.  Casal testified that the apartment properties located near Highway 26 and Tanasbourne (about two miles from the subject property) include "more bells and whistles" such as pools, playgrounds, and gyms, which make a difference to renters.

Casal testified that the apartment market was "struggling" as of January 1, 2010; the subject property had "quite a few vacancies," about six or seven units.  She testified that units also remained vacant for long periods of time.  Casal testified that, as of January 1, 2010, Plaintiff offered rent concessions including $300 off the first month of rent, two weeks free rent, and one month free rent; all concession required at least a six-month lease.  She testified that the 2007, 2008, and 2009 "budget comparison" reports and the January 1, 2010, rent roll provided by Plaintiff are accurate.  (*See* Ptf's Ex 10-24.)  The January 1, 2010, rent roll reveals that four of the subject property units were vacant.  (*Id.* at 24.)  Casal testified that the four garages rent for $75 per month and were all occupied as of the date of trial.

A.     *Plaintiff's value evidence*

Bean testified that the subject property is well-managed and does not have any deferred maintenance, but is "bland" and located in an area without many attractions such as shopping and restaurants.  He testified that all of the other apartment properties in the area include amenities and that renters look for properties with gyms and pools even though those amenities are rarely used.  Bean testified that he considered all three approaches of value, but did not use the cost approach due to the age of the subject property; he relied, instead, on the income and market approaches to prepare his "broker's opinion of value."  (*See* Ptf's Ex 1 at 6-8.)

/ / /

/ / /

1. *Income approach*

Bean used the subject property actual rents for his income analysis, stating "market rent" of $731,302 in 2007; $782,140 in 2008; and $794,160 in 2009. (Ptf's Ex 1 at 9.) He testified that the subject property received lower rents than other properties in the area because it has less to offer; he determined that the subject property actual rents are "appropriate" for the market. Bean also used Plaintiff's actual figures for loss to lease, vacancy loss, concessions,[4] and other income. He calculated effective gross income for the subject property of $722,015 in 2007, $754,312 in 2008, and $733,457 in 2009. (*Id.* at 9.) Bean testified that he used replacement reserves of $250 per unit, for a total of $21,000. (*See id.*) He testified that the subject property appears to be well-managed, noting that Princeton Property Management is "one of the top two or three" property management companies in Oregon, and he relied on the subject property's actual expenses (excluding property taxes) which were $301,761 in 2007; $320,899 in 2008; and $309,283 in 2009.[5] (*Id.*) Bean calculated NOI ranging from $399,254 to $412,413 for 2007 through 2009. (*Id.*)

Bean testified that, to determine an appropriate capitalization rate, he considered both actual sales from Washington County and market surveys from Marcus and Millichap, Norris & Stevens, Realty Rates, Real Capital Analytics, and the Barry Apartment Report, which specializes in apartments both smaller than the subject property and the same size. (*See* Ptf's Ex 1 at 25 (noting in bold font the reports that Bean considered most applicable to the subject

---

[4] Bean testified that rent concessions were necessary to complete in the market in 2009. He testified concerning additional market data supporting the market conditions in 2009: The first quarter 2010 Marcus & Millichap Portland Summary showed increased vacancy and decreased rents (both asking and effective); and the Norris & Stevens Fall/Winner 2009/2010, stated "[f]or apartment owners, the economic downturn * * * means higher vacancies, more evictions, lower rents, and, most definitely, lower effective rents * * *." (Ptf's Ex 1 at 26, 31.)

[5] As a percentage of effective gross income, Bean's expenses for the subject property not including property taxes were 41.8 percent in 2007, 42.5 percent in 2008, and 42.2 percent in 2009. (Ptf's Ex 1 at 9.)

property[6]).)  The capitalization rates of the six actual sales that Bean identified as comparable ranged from 6.35 percent to 7.27 percent with an average of 6.87 percent.  (*Id.* at 25, 44.)  Bean testified that some of the sales data that he considered involved apartments with 400 or more units, "investment grade" properties, which are not really comparable to the subject property.  He testified that the subject property is a suburban property, as contrasted with urban properties, which are typically more valuable properties.  Bean noted that, according to the Winter 2010 Barry Apartment Report, "typical cap[italization] rates of 7.25% to 8.50% [are expected] for suburban properties * * *."  (*Id.* at 39.)  He noted that Norris & Stevens reported 2009 sales activity by county, with the average capitalization rate for Washington County at 9.16 percent, the highest of the counties reported.  (*Id.* at 32.)  Bean testified that, based on his market research and his conclusion that the subject property is "not a dump," he determined a capitalization rate of 7.5 percent for the subject property.  He testified that he added a property tax rate of 1.1 percent for an overall rate of 8.6 percent and a 2010-11 real market value of $4,700,000.  (*Id.* at 9.)

        2.     *"Market data analysis"*

        Bean completed a "market data analysis" based on sales of comparable properties.  He described his methodology as follows:

> "To compare the sales to the subject [property] the [NOIs] were compared.  Since this is the key factor to an investor it makes sense to use it as a basis of analysis.  Also the NOI captures all factors that influence items of income and expense.  The comparison was made on a per unit basis. A ratio of subject NOI to comparable NOI is determined.  That ratio is then applied to the comparable sale price per unit to obtain an indication of value for the subject.  This is in effect equalizing the subject and the comparables on the basis of their earning power.  The goal is the same whether the adjustments are made on a specific item basis or are based on an overall unit comparison."

---

[6] Capitalization rates from Bean's most relevant market surveys (indicated in bold font) reportedly ranged from 6.70 to 9.16 percent.  (Ptf's Ex 1 at 25.)

(Ptf's Ex 1 at 7.)  Bean testified that, assuming a property is well-managed, NOI reflects differences including location, amenities, rent concessions, and any other differences with the exception of market conditions at the time of sale; NOI serves as a better "equalizer" than adjustments because it is objective.  Bean testified that he accounted for potential differences in market conditions by selecting sales from the same time and market conditions as January 1, 2010.  As support of his approach, Bean provided a July 1990 article from The Appraisal Journal, *An Analysis of Indicators of Multi-Family Complex Values*.  (*Id.* at 49-56.)

Bean identified six apartment sales for analysis in his "market data analysis"; the number of units for the complexes range from 65 to 312.  (Ptf's Ex 1 at 44.)  He testified that he had to use some properties that are much larger than the subject property due to limited available data.  Bean testified that he, nevertheless, considers his sales to be "reasonable."  Bean testified that the Markana Apartments and the Meridian Apartments are superior to the subject property and the Pacific Crest apartments are not necessarily superior to the subject property but, apparently, generate a higher NOI per unit.  (*See id.*)  Bean testified that he determined for each sale the NOI per unit; the subject property NOI divided by the comparable NOI expressed as a percentage; and the indicated value per unit.  (*Id.*)  Bean testified that he calculated the NOI for each comparable sale based on the sale price and the reported capitalization rate.  For the subject property NOI, Bean used $4,103 per unit,[7] which appears to be based on the actual 2009 NOI reported in the subject property 2009 budget comparison.  (*See id*. at 18, 44.)  The NOI per unit of Bean's comparable sales ranged from $4,712 for the Pacific Crest apartments to $6,268 per

_____

[7] The NOI per unit that Bean used for his market data analysis is less than the NOI that he determined under his income approach, $4,800, rounded, in part because the actual NOI reported by Plaintiff includes property taxes as an expense.  (*See* Ptf's Ex 1 at 9, 18.)  Bean testified that nobody reports taxes separately from expenses except for the purpose of tax appeals.

unit for the Stratford on Allen apartments. (*Id.* at 44.) Bean determined each indicated value per unit by multiplying the price per unit indicated by each sale by the percentage of the subject property NOI divided by the comparable sale NOI. (*Id.*) His indicated values per unit ranged from $56,437.41 to $64,614.17 with an average of $59,735.71. (*Id.*) The average indicated value per unit of $59,735.71 suggests a value of $5,017,800 for the subject property.

Bean testified that he gave most weight to the income approach. He testified that he did not complete a cost approach for the subject property due to its age.

B.    *Defendant's value evidence*

Frank testified that she inspected the subject property and found it to be in good condition. She testified that she considered all three approaches of value, the cost approach, the income approach, and the sales comparison approach. (*See* Def's Ex A at 12.)

1.    *Cost approach*

Frank testified that, under the cost approach, she determined a land value for the subject property based on three sales in Washington County; the first in Tigard in August 2009, the second in Tualatin in March 2008, and the third in Hillsboro two miles north of the subject property in April 2011. (*See id.* at 14.) She testified that the third sale was bank-owned and she considers it to be at the low end of the market. Frank testified that she determined a "price per unit" for each of the land sales and, giving most weight to land sale 1, concluded a price per unit of $15,000 for the subject property, for a land value of $1,260,000.[8] (*See id.* at 19.) Frank testified that she determined the subject property improvements value under the cost approach using Marshall & Swift Valuation Service cost estimator; she classified the subject property as

_____

[8] Frank testified that, for apartments, land is not valued based on price per square foot or price per acre, but rather on price per unit. She stated that "[t]he average density of development in Washington County for multi-family residences is between 20 and 24 units per acre." (Def's Ex A at 18.) "The subject site size is 3.39 acres developed as an 84 unit apartment complex. The developed density for the subject property is 24 units per acre." (*Id.*) Frank testified that land sales for apartment land have been relatively flat for some time.

"average" with an effective and actual age of 10 years. (*See id.* at 20, 22.) Frank testified that she determined a value of $4,810,050 for the apartment units, only, and a value of $5,299,030 for the units and amenities. (*See id.* at 22, 23.) Frank concluded total value for the subject property under the cost approach of $6,559,030. (*Id.* at 24.)

2.   *Sales comparison approach*

Frank testified that she looked for properties with similar unit mixes and of a similar size and identified four comparable sales in Washington County. (*See* Def's Ex A at 25.) Frank testified that sale 1 is West Slope Terrace, formerly the Markana, a 96-unit property in Portland of average quality and better "access" than the subject property. (*See id.* at 25, 26.) She testified that sale 1 was built in 1968 with maintenance updates in 2009.[9] (*See id.* at 25.) Sale 1 sold on December 16, 2010, for $84,375 per unit at a capitalization rate of 6.75 percent.[10] (*Id.* at 25,26.) Frank concluded an adjusted sale price of $80,156 per unit for sale 1. (*Id.* at 30.) Frank testified that sale 2 is the Hallwood apartment complex in Beaverton, a 76-unit property that sold on February 1, 2010, for $73,684 per unit at a capitalization rate of 6.75 percent.[11] (*See id.* at 25, 27.) She determined an adjusted price per unit of $73,684. (*Id.* at 30.) Frank testified that sale 3 is the Stratford on Allen, a 65-unit complex in Beaverton about 3 miles southwest of the subject property that sold on February 23, 2009, for $95,692 per unit at a capitalization rate of 6.55 percent. (*See id.* at 25, 28.) She testified that sale 3 is slightly superior to the subject property with respect to condition and location; she concluded an adjusted price per unit of $90,907. (*See id.* at 30.) Frank testified that sale 4 is the Willow Creek apartment complex, a 77-unit property

---

[9] Frank testified on cross examination that she considered the quality of sale 1 to be inferior to the subject property because it has both flat roofs and pitched roofs and parking is inconvenient.

[10] Frank submitted evidence stating a capitalization rate for sale 1 of 7.00 percent. (Def's Ex A at 56.)

[11] Frank testified on cross examination that the broker for sale 2 provided the capitalization rate of 6.75 percent, but Frank does not know if that is the listing. Frank testified that she calculated a rate of 7.6 percent.

located about one mile north of the subject property in Aloha that sold on February 19, 2010, for $62,338 per unit at a capitalization rate of 6.25 percent.[12] (*See id.* at 25, 29.) She testified that sale 4 is similar to the subject property in age, inferior in condition and unit mix, and superior with respect to amenities; she determined an adjusted price per unit of $62,338. (*Id.* at 30.)

Frank adjusted two of her comparable sales for "unit mix." (Def's Ex A at 30.) On cross examination, she testified that, based on her conversations with managers and brokers, an investor in the market would prefer a mix of units. Frank concluded a value of $75,000 per unit based on her comparable sales for a value of $6,300,000. (*Id.*) Bean testified that he and Frank used some of the same comparable sales, but their "adjustments" varied quite a bit. He noted that *all* of Frank's adjustments were five percent adjustments, but there is no apparent basis for five percent adjustments; they appear to be arbitrary. Bean provided as rebuttal an analysis of Frank's comparable sales using Bean's NOI per unit analysis. (Ptf's Rebuttal Ex 3.) He determined indicated values per unit ranging from $60,785.19 to $65,648, with an average of $62,464.90, for Frank's four comparable sales.[13] (*Id.*)

3.    *Income approach*

Frank testified that she identified four rent comparables for the subject property. (*See* Def's Ex A at 31-36.) She determined that "[t]he market rents indicated * * * by comparable apartment properties * * * in the [s]ubject [property']s market area tend to fall in the range of the actual rents. Loss to lease is accounted for in the market rent." (*Id.* at 36.) Frank concluded potential gross income of $759,804 for the subject property. (*Id.* at 38.) She testified that she concluded "other income" of $22,794, based on the subject property actual income, and

---

[12] Frank testified that her sale 4 rate was 9.00 percent based on actual rents. (Def's Ex A at 25, 38, 65.)

[13] At $62,484.90 per unit, the subject property value is $5,247,051.60.

"concessions" of $15,196. (*See id.*) Frank testified that she determined vacancy of 5.5 percent for the subject property based on both actual market vacancy rates and market data from Norris & Stevens, Marcus & Millichap, and the Barry Apartment Report.[14] (*See id.* at 37, 38, 81-84.) Frank did not calculate effective gross income, but it appears to be $725,613. (*See id.* at 38.)

Frank testified that she concluded a 38 percent expense ratio, not including taxes and including two percent replacement reserves, based on Defendant's expense ratio study and market surveys reporting expenses ranging from 36.5 to 50 percent. (*See* Def's Ex A at 37, 75-80.) Plaintiff's counsel noted that Defendant's study includes expenses for water/sewer, garbage, pool, electricity, and insurance; he asked whether other expenses such as landscaping and maintenance were included. (*See* Def's Ex A at 76-77.) Frank testified in response that she did not complete the expense study and she was not sure.

Frank testified that she selected a capitalization rate of 6.25 percent based on four comparable sales ranging from six to nine percent[15] and market surveys reporting capitalization rates ranging from 6.35 percent to 7.9 percent.[16] (*See* Def's Ex A at 38.) She added a tax rate of 1.35 percent for an overall rate of 7.6 percent and an indicated value of $5,843,500. (*Id.*) Frank testified that she gave the most weight to the income approach, "secondary weight" to the sales comparison approach, and the "least weight" to the cost approach and concluded a value of $5,843,500. (*Id.* at 40.)

/ / /

---

[14] Frank reported actual vacancy of 5.0, 8.0, 4.55, and 6.0 percent for her four rent comparables; market surveys reported vacancy of 4.80 to 6 percent. (Def's Ex A at 37.)

[15] Bean testified that the capitalization rates that Frank derived from actual sales are problematic because she did not use actual NOI at the time of the sale to determine the capitalization rate and, instead, relied on listing NOI in several instances. He also testified that Frank made adjustments to her capitalization rates derived from actual sales, which is a "non-standard procedure."

[16] Frank testified on cross examination that the fourth quarter 2009 IRR-Market Pulse reports 7.78 percent for class B properties. (Def's Ex A at 79.)

DECISION TC-MD 110469D                                                                                    10

The 2010-11 real market value of the subject property determined by the board of property tax appeals was $6,107,330. (Ptf's Compl at 2.) The 2010-11 maximum assessed value of the subject property was $5,217,700. (*Id.*) Plaintiff requests a 2010-11 real market value of $4,800,000. (Ptf's Ex 1 at 1.) Defendant determined that the 2010-11 real market value of the subject property is $5,843,500. (Def's Ex A at 40.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[17]

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2); OAR 150-308.205-(A)(2)(a). There are three methods of valuation that must be considered, although all three may not be applicable in every case: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. OAR 150-308.205-(A)(2)(a); *see also Allen v. Dept. of Rev.* (*Allen*), 17 OTR 248, 252 (2003). Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence

---

[17] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Both parties agree that the income approach should be given the most weight. Defendant determined values under the sales comparison and cost approaches, concluding that those approaches should be given "secondary" and "the least" weight, respectively; however, Defendant's value conclusion appears to be based entirely on the income approach. Plaintiff provided a market data analysis, relying on comparable sales, and gave that approach secondary weight to the income approach. The court finds that the income approach should be given the most weight in this analysis and that no weight should be given to the cost approach.

A.    *Income approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17 OTR at 253 (citation omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income * * *." *Id.* at 253. "NOI is the currently expected net income of a property after all operating expenses are deducted from gross income. To calculate the NOI, appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Allen*, 17 OTR at 254 (citing Appraisal Institute, *The Appraisal of Real Estate* 484 (12th ed 2001)).

"[T]he income approach should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate." *Confehr v.*

*Multnomah County Assessor* (*Confehr*), TC-MD No 110621D at 14 (Feb 27, 2012) (citing *Bauman et al v. Dept. of Rev.*, 6 OTR 426, 433 (1976) (citations omitted)); *see also Valley River Ctr. et al v. Dept. of Rev.*, 6 OTR 368, 372 (1976). Plaintiff provided three years of income and expense data for the subject property, which had been in operation for over ten years as of January 1, 2010. Bean relied on the subject property actual rents, other income, loss to lease, vacancy loss, and concessions and concluded effective gross income of $733,457 in 2009. Frank relied on market rents, which supported the subject property actual rents, and the subject property actual income and concessions; she used a vacancy rate of 5.5 percent. Frank's effective gross income is $725,613. The court finds that the subject property actual income, loss to lease, vacancy, and concessions are supported by the market date and provide the best evidence of value in this case. The court concludes effective gross income of $733,457.

The parties disagree with respect to operating expenses. Bean relied on the subject property actual expenses which, as a percentage of effective gross income and excluding property taxes, ranged from 41.8 percent to 42.5 percent between 2007 and 2009. He also included replacement reserves of $250 per unit, or $21,000. Frank determined expenses of 38 percent, including reserves, based on Defendant's expense ratio study. The subject property is well-managed and Plaintiff's actual expenses are reasonable in this case. Furthermore, Defendant's expense ratio is problematic because it appears to capture some, but not all typical expenses. The court finds that reasonable expenses for the subject property were 42 percent as of January 1, 2010, or $308,052. Including Bean's replacement reserve of $21,000, the court concludes that expenses were $329,052, for NOI of $404,405.

"A cap[italization] rate is generally calculated using market sales. Slight deviations in cap[italization] rates profoundly change the estimated value of a property, making the proper

calculation of the rate of paramount importance." *Allen*, 17 OTR at 260. The parties also disagree with respect to an appropriate capitalization rate for the subject property as of January 1, 2010. Bean considered both actual sales in Washington County (rates ranged from 6.35 percent to 7.27 percent) and market surveys (rate ranged from 6.7 to 9.16 percent) and he concluded a capitalization rate of 7.5 percent for the subject property, to which he added a tax rate of 1.1 percent for an overall rate of 8.6 percent. Frank determined a capitalization rate of 6.25 percent based on actual comparable sales with rates ranging from six to nine percent and market surveys reporting capitalization rates ranging from 6.35 percent to 7.9 percent. She added a tax rate of 1.35 percent for an overall rate of 7.6 percent. Frank revised several of her capitalization rate calculations at trial because the rates included in her report, apparently, were not based on the actual NOI at the time of each sale. The court found the testimony with respect to how Frank's capitalization rates were calculated to be confusing and finds that her reported rates from actual sales are unreliable in this case.

As stated by Bean, the subject property is "not a dump," although it is located in a less desirable area and offers fewer amenities than many of the other sales discussed by the parties. Accordingly, the court finds that a reasonable capitalization rate for the subject property as of January 1, 2010, was 7.25 percent. Including the property tax rate of 1.35 percent reported by Defendant, the court finds that the overall rate applicable to the subject property was 8.6 percent for an indicated value of $4,702,000 under the income approach.

B.    *Sales comparison approach*

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

OAR 150-308.205-(A)(2)(c). "The court looks for arm's length sale transactions of property

similar in size, quality, age and location * * * in order to determine the real market value" of the subject property. *Richardson*, WL 21263620 at *3.

Bean completed a "market data analysis" in which he used NOI as a substitute for adjustments and developed an "indicated value per unit" for each comparable sale identified. In support of his methodology, Bean provided a July 1990 article entitled *An Analysis of Indicators of Multi-Family Complex Values* published in The Appraisal Journal. In a recent decision, this court discussed the reliability of Bean's "market data analysis" and concluded that "Plaintiff offered no statute or administrative rule that authorizes or states that a market data analysis is equivalent to or a substitute for a sales comparable approach." *Confehr*, TC-MD No 110621D at 13.

Frank determined a value of $75,000 per unit under her sales comparison approach for a value of $6,300,000. Plaintiff criticized Frank's adjustments to her comparable sales because each adjustment was five percent, up or down, without any explanation. Plaintiff found it difficult to understand how each difference between Frank's comparable sales and the subject property required a five percent adjustment as opposed to a 10 or 12 percent adjustment, for example. Plaintiff's criticism raises questions as to the reliability of Frank's adjustments, but Plaintiff failed to provide any reliable evidence to rebut Frank's adjustments to her comparable sales. The court finds that, of the comparable sales identified by Frank, sales 2 and 4 provide the best evidence of value for the subject property under the sales comparison approach. The court finds that the value of the subject property under the sales comparison approach as of January 1, 2010, was $68,000 per unit, or $5,700,000, rounded.

/ / /

/ / /

### III.  CONCLUSION

As stated above, the court finds that the income approach should be given the most weight in this analysis, with less weight given to the sales comparison approach.  After careful consideration of the testimony and evidence presented, the court finds that the real market value of the subject property as of January 1, 2010, was $4,950,000.  Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account R47130 was $4,950,000 for the 2010-11 tax year.

Dated this ____ day of April 2012.

_____
ALLISON R. BOOMER
MAGISTRATE PRO TEMPORE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Pro Tempore Allison R. Boomer on April 3, 2012.  The Court filed and entered this Decision on April 3, 2012.*