IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| SANDY INN OMRS LLC | ) | |
| and BEST WESTERN SANDY INN, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 120549D |
| | ) | |
| v. | ) | |
| | ) | |
| CLACKAMAS COUNTY ASSESSOR, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiffs appeal the 2011-12 real market value of property identified as Account

05017195 (subject property).[1]  A trial was held in the Oregon Tax Courtroom, Salem, Oregon on

October 15, 2012.  W. Scott Phinney, Attorney, appeared on behalf of Plaintiffs.  Richard

Michael Bean (Bean), broker, testified on behalf of Plaintiffs.  David W. Sohm (Sohm),

Appraiser II, Clackamas County Assessment and Taxation, appeared and testified on behalf of

Defendant.

Plaintiffs' Exhibits 1 through 4 and Defendant's Exhibit A, and Rebuttal Exhibits B,

pages 1 through 4, and 9 through 12, C, and D page 5 were received without objection.

## I.  STATEMENT OF FACTS

The parties agreed that the highest and best improved use of the subject property is its

current use.  (Ptfs' Ex 1 at 5; Def's Ex A at 6.)  The subject property "is a 45 unit limited service

motel located in Sandy, Oregon" that was built in 1996.  (Ptfs' Ex 1 at 3.)  The subject property

is described by Sohm as "of modern design with interior hallways and an indoor pool, hot tub,

exercise room, breakfast room, high speed internet access, 24 hour business center, and guest

---

[1] Plaintiffs' appealed Account P2228774 but subsequently accepted the real market value and assessed
value stated on the Clackamas County Board of Property Tax Appeals, dated April 10, 2012.

laundry." (Def's Ex A at 5.) The parties agree that the subject property is affiliated with the Best Western motel chain, paying a franchise fee for the affiliation and a commission fee for the use of Best Western's reservation system. (*Id*.; Ptfs' Ex 1 at 5.) The parties dispute the subject property's visibility from Highway 26. Sohm testified that the subject property is the "gateway to the Mt. Hood Recreation Area."

Both parties agree that the cost approach is not a reliable and applicable valuation method for the subject property. (Ptfs' Ex 1 at 5; Def's Ex A at 10.) Bean testified that his broker opinion of value did not "rely heavily on the market approach." He testified he gathered nine "comparable sales from LoopNet," computing a price per room ($20,193) based on the selling price and number of available rooms because there was "not enough data to make adjustments." (Ptfs' Ex 1 at 15-36.) Bean testified that for the subject property he computed an indicated value of $908,670. (*Id*. at 15.) He stated that "[d]ue to the lack of adequate sales data for truly comparable properties, this approach was used as a check on the income approach." (*Id*. at 5.) Sohm challenged the comparability of the nine properties to the subject property, noting for some or all of the properties the year built, access, exterior corridors, room count and deferred maintenance/renovation, stating that one of the sales was a "distress sale" and another was not a recorded sale, and confirming that Bean had not inspected the properties or independently verified the reported data.

Bean responded, stating that in making his comparable property selection he placed the most importance on "seasonal business located in a small city." Sohm testified that the "key factors in the evaluation of a motel or hotel operation are the Average Daily Rate (ADR), Occupancy Rate, and RevPAR (Revenue Per Available Room.) * * * The RevPAR is a

/ / /

measure of the income generating capacity of the property and a key to valuation and comparison to other sold or competing properties." (Def's Ex A at 11.)

For his sales comparison approach, Sohm testified that the "units of comparison * * * were price per room and price per square foot." (*Id.*) Sohm briefly reviewed each of the four properties that he selected as comparable to the subject property. Plaintiffs challenged the comparability of the four properties to the subject property, noting that the population estimates and traffic counts are substantially larger than the subject property's location. (Ptfs' Ex 4.) Sohm responded stating that the "RevPAR for comparable sale one was pretty similar to the subject property." Sohm acknowledged that comparable sale three was a "distress sale," but stated that it was "okay to use if adjusted for issues," specifically "expenditures after sale." He stated that comparable sale four "lost its Best Western flag" 13 months after the reported sale which was part of a "1031 exchange." Sohm stated that:

> "The sales reflect a range of price per room from $33,898 for an older low quality property to $70,000 for a well located and superior quality property. * * * Percentage adjustments have been made in an attempt to reasonably narrow the range of indications While quantitative support for these adjustments is not provided by the data, they reflect the experience of the appraiser and the input of market participants in weighing differences among the researched sales."

(Def's Ex A at 11.) "After considering the four sale properties in comparison to the subject property a range of indications emerges. The price per room comparison yields indications ranging from $44,068 to $49,000." (*Id.* at 22.) Sohm concluded that "[s]ale 1 is given greater credence" in "selecting a price per room of $46,000 to apply to the subject property" to determine an indicated "property value of $2,070,000. (*Id.*) "When the reported value of the FF&E [furniture, fixtures and equipment] from the personal property account of $80,622 is deducted, the remaining value of the real property is estimated to be $1,989,378, which is rounded to $1,989,000." (*Id.* at 23.)

Bean testified that in determining the subject property's real market value he gave the most weight to the income approach. (Ptfs' Ex 1 at 7.) He testified that his income approach was based on the three year "profit and loss" statement provided by the property owner. (*See id.* at 9.) Bean testified that he increased the reported net operating income by the same amount ($27,500) each year for property taxes that were claimed as an operating expense. (*Id.* at 8.) He stated that "[a]llowing the franchise fees and commissions to remain as a cost of goods sold is a simple way of reflecting the value of the 'Best Western' flag. Those figures represent the value of the flag and reduce the real property value." (*Id.* at 5.) Sohm challenged the accuracy of Plaintiffs' profit and loss statements, stating that payroll and related expenses are "typically" reported as part of the departmental expenses (rooms, food and beverage, telecommunications, other operated departments) and undistributed operating expenses (administrative and general, marketing and property operations and maintenance), and suggesting that Plaintiffs' profit and loss statement "double counted" payroll expense. (*See* Def's Rebuttal Ex C at 1.)

Bean testified that the Star (Smith Travel Research) Reports support the profit and loss statement provided by Plaintiffs. Sohm challenged the accuracy of the Star Report for December 2010, stating that he contacted Smith Travel Research and the data as submitted is incorrect. (Defs' Rebuttal Ex D at 5.) Bean responded that the Star Report "had no effect on his analysis."

Bean testified that "the base cap[italization] rate of 11.0% was taken from a combination of sales data, surveys and literature." (Ptf's Ex 1 at 6.) Sohm questioned Bean about his reliance on the "RealtyRates.com Investor Survey - 1st Quarter 2012, Current & Historical Cap Rate Indices," which show a "Rate" of 11.17 for "Lodging" in the first quarter of 2011. (*Id.* at 13.) Bean responded stating that he believes that RealtyRates.com is based on a "broad range" rather than "localities." Bean testified that "an effective tax rate of 1.53 percent was added to the base

capitalization rate." A direct capitalization method was used to determine an indicated value of $644,500 based on the three years of stabilized operating history. (*Id*. at 6.)

Sohm's income approach relied on "the reported figures for the subject property," computing gross revenue of $755,550. (Def's Ex A at 25.) "Typical expenses for motels under 75 rooms as published in the 2010 HOST Study by Smith Travel Research have been used to reflect the expenses for the subject motel," resulting in an "income before fixed charges" that is 36.1 percent of gross revenue. (*Id*. at 25-26.) Sohm was asked why he "used a size category rather than geographical category to determine operating expenses"; he responded stating that there are "economies of scale" and "71.5 percent is typical expense operating percentage for under 75 units." Sohm testified that "income before fixed charges" was adjusted for insurance (one and one-half percent of gross revenue) and reserves for replacement (four percent of gross revenue). (*Id*. at 26.) He testified that the "net operating income indicated for the subject motel is $235,916." (*Id*.)

> In determining a capitalization rate, Sohm stated that:
>
> "Overall rates indicated by the market sales in the table on page 17 vary from 9.84% to 12.33% before adjustment for reserves. * * * With reserves factored into the sales, the range of adjusted overall capitalization rates ranges from 8.85% to 11.24%. The low end of this range is reflected by a dated sale. The high end is reflected by a low quality motel with much lower RevPAR than the subject property commands. Sales 1 and 2 reflect overall rates adjusted for reserves of 9.58% and 9.53%, respectively. These properties are the most comparable reflections of income potential and risk to the subject motel. An overall capitalization rate of 9.6% is selected."

(*Id*. at 26-27.) In response to questions, Sohm testified that in computing an overall capitalization rate, he "lowered income and capitalization rate for a reserves adjustment so that he would not overestimate the value of the subject property." Sohm testified that to the overall capitalization rate of 9.6 percent he added a property tax rate of 1.53 percent, resulting in a

capitalization rate of 11.13 percent. Sohm stated that "[w]hen the reported value of the FF&E from the personal property account of $80,622 is deducted, the remaining value of the real property is estimated to be $2,039,019, which is rounded to $2,039,000." (*Id*. at 27.) Sohm concluded that "[o]verall, the income approach is reliable and provides a strong indication of value for tax assessment purposes. Based on the data and analysis the income approach is given greater credence in concluding a retrospective real market value as of January 1, 2011 of $2,035,000. (*Id*. at 28.) Sohm testified that the subject property's real market value is "at least" $2,000,000.

## II. ANALYSIS

The issue before the court is the subject property's real market value as of January 1, 2011. In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232.[2] ORS 308.205(1) defines real market value as:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

Real market value is determined by the particular methods and procedures adopted by the Department of Revenue. ORS 308.205(2). There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); *see also* OAR 150-308.205-(A)(2)(a). The valuation approach to be used is a question of fact to be determined on the record. *Pacific Power and Light Co. v. Dept. of Rev.*,

---

[2] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2011.

286 Or 529, 533, 596 P2d 912 (1979). The parties considered two (income and comparable sales) of three approaches to valuation. Plaintiffs concluded that there was not enough data available to "fully develop the market approach" and "the income approach better reflects the market of typical buyers and sellers." (Ptfs' Ex 1 at 7.) Defendant concluded that the subject property's real market value is best determined by the income approach. (Def's Ex A at 28.) "In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief." ORS 305.427. Plaintiffs must establish their claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Rev.*, 4 OTR 302 (1971)). This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers. *Danielson v. Multnomah County Assessor*, TC-MD No 110300D, WL 879285 (Mar 13, 2012).

A.      *Income capitalization approach*

"Any property that generates income can be valued using the income capitalization approach." *NYEI v. Umatilla Co*, TC-MD 100605D, WL 114202 at *10 (Jan 13, 2012) (citing Appraisal Institute, *The Appraisal of Real Estate* 447 (13th ed 2008)). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to

the approach." *Id.* at 447. Anticipation is defined as "the perception that value is created by the expectation of benefits to be derived in the future." *Id*. at 35. Because the primary use of the subject property is a commercial business, both parties determined the subject property's real market value using the income approach.

"The income approach should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate." *Confehr v. Multnomah County Assessor* (*Confehr*), TC-MD No 110621D, WL 659199 at *8 (Feb 27, 2012) (citing *Bauman et al v. Dept. of Rev.*, 6 OTR 426, 433 (1976) (citations omitted)); *see also Valley River Ctr. Et Al v. Dept. of Rev.*, 6 OTR 368, 372 (1976).

Bean's income approach relied on a profit and loss statement for January 2008 through June 2010 that he testified was provided by the property owner. (Ptfs' Ex 1 at 9.) The property owner who allegedly provided the statement to Bean did not testify. Bean had no knowledge of the content of the profit and loss statement and was unable to respond to Sohm's questions and critique. The profit and loss statement was not offered by the individual who prepared the statement. There is no evidence that the statement was an audited financial statement or that the data is reliable. The court places no reliance on an income approach based on a document prepared by someone who does not testify as to its authenticity.

B.       *Comparable sales approach*

The comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp and McKenzie River Motors v. Lane County Assessor*, TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001)). ORS 308.205(2) provides

in pertinent part that "[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating that:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

Bean testified that he did not verify that each of the transactions was an "arms-length market transaction." (*Id*.) Bean made no adjustments to the properties he identified as comparable to the subject property. Bean's modified comparable sales approach does not comply with the applicable rules and is not persuasive as to the subject property's real market value.

Plaintiffs' evidence in support of its requested real market value reduction is inconclusive. When the "evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof ***." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). Plaintiffs failed to carry their burden of proof.

Even though the burden has not shifted under ORS 305.427, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Sohm gave greater credence to the income approach, concluding that the subject property's real market value was at least $2,000,000. The court has concluded that the profit and loss statement offered by Plaintiff has not been authenticated. Because Sohm was not provided with the subject property's operating statement even though requested, Sohm relied on an undated Smith Travel Research Host Study to determine operating expenses. (Def's Ex A at 30.) The court gives no weight to data from a national report that is generic and undated. The issue before the court is the subject property's

real market value, not the real market value of a motel "with under 75 rooms" located somewhere. (*Id*. at 31.) Sohm gave "greater credence" to the income approach, agreeing with Plaintiffs that the lack of data reduced their reliance on the comparable sales approach. (Def's Ex A at 28.) However, the court concluded that the validity of the income approach has not been proven. In the alternative, the court finds that Defendant's comparable sales approach supports the Clackamas County Board of Property Tax Appeals Order and Defendant's original real market tax roll value of $1,663,622. (*Id*. at 4.)

### III. CONCLUSION

After careful review of the testimony and evidence, the court concludes that Plaintiffs failed to carry their burden of proof. The court concludes that there is insufficient evidence before it to make a determination of the subject property's real market value. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of December 2012.

_____
JILL A. TANNER
PRESIDING MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Presiding Magistrate Jill A. Tanner on December 17, 2012. The court filed and entered this Decision on December 17, 2012.*