IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

TOY BOX MAXI-STORAGE LLC,     )
                                     )
         Plaintiff,              )    TC-MD 110339C
                                       )
        v.                            )
                                       )
JACKSON COUNTY ASSESSOR,       )
                                       )
        Defendant.           )    **DECISION**

Plaintiff appeals the 2010-11[1] real market value of property identified as Account 10258217. A telephone trial was held on Monday, March 26, 2012. William Alan Smith (Smith), partner and certified financial advisor, appeared on behalf of Plaintiff. David B. Arrasmith (Arrasmith), Deputy Assessor, Jackson County and registered appraiser, appeared on behalf of Defendant.

Plaintiff's Exhibits 1 through 8 and Defendant's Exhibit A were admitted without objection.

## I. STATEMENT OF FACTS

Smith testified that the subject property is a maxi-storage facility designed to store large vehicles, including recreational vehicles. He testified that the storage units range in size from 24 square feet to 30 feet by 47 feet and cost more per square foot to operate. Smith testified that in contrast, mini-storage facility units range in size from 5 feet by 10 feet and 10 feet by 20 feet. Arrasmith testified that the subject property is located on 2.27 acres of level land. There are two multi-tenant storage buildings with a total of 33,460 square feet and some "yard improvements,"

/ / /

---

[1] Plaintiff's Complaint stated that tax years appealed were 2008, 2009, 2010, and 2011. In its Order, filed October 17, 2011, the court dismissed all tax years except the 2010-11 tax year.

including lights and bumper posts." (*See* Def's Ex A at 4.)  Arrasmith testified that the subject property is a "flag lot" located in an area zoned "light industrial" (L-I).

Plaintiff appeals the Board of Property Tax Appeals (BOPTA) Order, dated April 6, 2011, determining a real market value of $800,000.  According to the BOPTA Order, the subject property's maximum assessed value is $1,026,830.  Smith testified that Plaintiff is requesting a real market value of no more than $450,000 as of January 1, 2010.  He later testified that because the subject property "has never made any money" and "in fact has lost money every since" it "opened in June, 2007," the real market value based on "actual P/L statements" is "zero." Arrasmith testified that Defendant is requesting a real market value of $1,200,000.  (*See* Def's Ex A at 1.)

Arrasmith testified that he considered the three valuation approaches in determining the subject property's 2010-11 real market value.  (*See* Def's Ex A.)  He testified that the highest and best use of the subject property is its current "use as improved." (*See id*. at 16.)

Arrasmith testified that because the "subject property is only a couple years old," the cost approach is applicable for the subject property.  He determined the subject property's land real market value relying on a "direct sales comparison analysis" using two land sales and one land listing. (*See id*. at 17, 29-34.)  After making adjustments for time, off site improvements, location and size, Arrasmith computed an adjusted price per square foot ranging from $2.70 to $3.71. (*Id*. at 17.)  He concluded that "approximately $2.78 per square foot * * * affirms the tax roll value for the land of $275,150 (2.27 acres @ approximately $2.78 per square foot)." (*Id*. at 18.)  Arrasmith stated in his appraisal report that "[i]mprovement valuation in the cost approach involves estimating the current replacement or reproduction cost, less allowances for depreciation, functional obsolescence, and external obsolescence.  The building and yard

improvement costs were developed using Marshal Valuation Services Commercial Cost Estimator." (*Id*.) After applying a five percent entrepreneur profit, five percent current cost multiplier, and seven percent local cost multiplier, Arrasmith determined total replacement cost new to be $1,152,920. (*Id*.) He reduced that value by five percent for physical depreciation and 15 percent for external obsolescence to determine replacement cost new less depreciation in the amount of $922,300. (*Id*. at 19.) Arrasmith determined a total land and improvement real market value of $1,197,450. (*Id*.)

Smith testified that the sales comparable approach is not applicable to the subject property because there are no sales of comparable maxi-storage facilities. He testified that there is one other maxi-storage facility in the area and "it's not on the market." Arrasmith testified that he identified three properties that were comparable to the subject property. (*See* Def's Ex A at 20.) Two of the three properties were mini-storage facilities and no description was provided for the third property. (*Id*. at 36-38.) Only one of the properties was located in the same city as the subject property. (*Id*. at 20, 36-37.) One property was located in an "M-1" zone unlike the subject property, and two other properties were located in an "L-I" zone. (*Id*. at 20, 36-38.) One property was built in 1981 and the other two properties were built in 2005 and 2006. (*Id*.) The size of the three properties varied from 12,000 square feet to 47,065 square feet. (*Id.*) All sales occurred in 2009 between June and September. (*Id*.) Arrasmith made time and location adjustments to each property's sale price, resulting in an adjusted price per square foot of $36.71 to $51.12. (*Id*. at 20.) Arrasmith testified that "a price per square foot of $38.00 is estimated as the best indication of the subject's value, or a total real market value of $1,271,500. (*Id*.)

Both parties presented the income approach. Both parties agree that the subject property's potential gross income is $145,030. (Ptf's Ex 6 at 1; Def's Ex A at 21.)

Arrasmith testified that to determine a vacancy rate he surveyed the "surrounding self-storages businesses," concluding that "the average vacancy rate would be 16%." (*Id*. at 22.) The vacancy rate for the "Big Boy Maxi Storage" was 28 percent. (*Id*.) Smith testified that "it seemed much more reasonable to me to estimate the vacancy rate only two years hence, based on the recent demonstrated performance[,]" and that "[d]oing so results in an average vacancy rate of 43.8%." (*See* Ptf's Ltr at 2, Mar 9, 2012; Ptf's Ex 5.)

Smith determined that operating expenses were 53.29 percent of effective gross income. (Ptf's Ex 5.) Smith included the property tax expense in operating expenses. (Ptf's Ltr at 1, Mar 9, 2012.) Arrasmith determined operating expenses using "the 2009 profit and loss statement" and subtracting mortgage interest expense and property tax expense. (Def's Ex A at 23.) Arrasmith determined an operating expense of $15,675, or approximately 12.8 percent of effective gross income. (*Id*.) When asked why he used only the 2009 profit and loss statement, Arrasmith testified that he was not given the 2008 profit and loss statement, and at January 1, 2010, he would not be "aware of future 2010 income and expenses."

Arrasmith testified that to the operating expenses he added a four percent reserve for replacement. (*See id*.) Smith made no comparable adjustment. (*See* Ptf's Ex 5.)

Smith determined a net operating income of $38,072. (*Id*.; Ptf's Ex 8.) Arrasmith testified that he determined a net operating income of $101,275. (Def's Ex A at 23.)

Arrasmith testified that he determined a seven percent capitalization rate based on "comparable sales." (*Id*. at 24.) Arrasmith relied on the three properties that he used in the sales comparable approach and one sale dated May 31, 2008, for which no property characteristic information other than a "Correction Statutory Warranty Deed" was submitted. (*Id*. at Addendum B.) Smith testified that he used an 8.460 percent capitalization rate because

Arrasmith used that rate at the BOPTA hearing and that the source of that rate was a "Korpacz report." (*See* Ptf's Ex 8.) To his capitalization rate, Arrasmith added a property tax rate. (Def's Ex A at 24a.)[2] He determined the property tax rate to be 1.43 percent (property tax rate times the changed property tax ratio). (*Id.*) Smith wrote: "Since property taxes are in fact an operating expense that any potential investor would consider in purchasing any income-producing property based on its potential cap rate, I included property taxes as an expense in calculating the 8.46% cap rate suggested by Deputy Assessor Arrasmith. This increases the total operating expense to 53.29% of income[.]" (Ptf's Ltr at 1, Mar 9, 2012.)

Using net operating income of $38,072 and a capitalization rate of 8.46 percent, Smith determined the subject property's real market value to be $450,021. (Ptf's Ex 5.) Arrasmith testified that he determined an "[i]ndicated value for the subject property" of $1,201,410. (Def's Ex A at 24a.)

Smith concluded, stating:

> "Since there are no comparable sales available for maxi storage property in Southern Oregon, and construction costs incurred before the real estate market collapse have no reasonable bearing on the value of the property after the real estate market collapse, valuing the property by determining its present and projected value based on income would appear to be a more reasonable method."

(Ptf's Ltr at 2, Mar 9, 2012.) Arrasmith concluded that "no one approach stands out as clearly superior to the others. * * * This appraisal report has established a range of value for the subject of between $1,197,450 and $1,271,500. * * * [I]n my opinion the value of the subject real property land and improvement as of January 1, 2010, is: *$1,200,000*." (Def's Ex A at 24b) (emphasis in original).

/ / /

---

[2] Defendant's Exhibit A has two pages labeled "24." For clarity, the court identifies the pages as "24a" and "24b."

## II. ANALYSIS

The issue before this court is the subject property's real market value for tax year 2010-11. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor,* TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.,* 13 OTR 343, 345 (1995)). ORS 308.205(1) defines the "real market value" of both real and personal property as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller [in exchange for the property], each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[3] OAR 150-308.205-(A)(2)(a) sets out three "approaches" that Plaintiff "must" consider when determining the real market value of property: the sales comparison approach, cost approach, and income approach.[4] *See* ORS 308.205(2). Plaintiff presented a modified income approach, relying solely on the subject property's 2009 and 2010 operating statements and Arrasmith's analysis presented at the BOPTA hearing. Defendant's appraisal report considered all three approaches.

"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427 (2005). Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530 at 5 (July 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)). This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the RMV [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005)

---

[3] All references to Oregon Revised Statutes (ORS) are to the 2009 edition.

[4] All references to Oregon Administrative Rules (OAR) are to the 2010 edition.

(quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers.

Plaintiff offered his own testimony as a certified financial advisor who previously marketed real estate investment trusts in support of his requested real market value. He did not submit an appraisal report. Plaintiff's only evidence to rebut Defendant's appraisal report was his reliance on the subject property's operating statements for 2009 and 2010, his criticism of the three valuation approaches presented in Arrasmith's appraisal report, and Arrasmith's real market value determination for the BOPTA hearing. Smith presented a modified income approach but offered no evidence to support his capitalization rate. "A cap[italization] rate is generally calculated using market sales. Slight deviations in cap[italization] rates profoundly change the estimated value of a property, making the proper calculation of the rate of paramount importance." *Allen v. Dept. of Rev.*, 17 OTR 248, 260 (2003). Smith included property taxes in operating expenses even though this court has previously stated a preference for adding a property tax rate to the capitalization rate to develop an overall capitalization rate. Unfortunately, Plaintiff's testimony alone cannot stand in the place of competent evidence, such as an appraisal report, other supporting documents, and the expert testimony of individuals trained in property valuation, to determine the subject property's real market value as of the assessment date.

Plaintiff's evidence in support of its requested real market value reduction is inconclusive. When the "evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof ***." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). Plaintiff has failed to carry his burden of proof.

/ / /

Even though the burden has not shifted under ORS 305.427, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Arrasmith's appraisal report included the three valuation approaches. Looking first at his cost approach, Arrasmith made various adjustments to the computed improvement cost, including current cost modifier, local cost multiplier, physical depreciation, and external obsolescence. (Def's Ex A at 18-19.) Arrasmith submitted supplemental information for three of the four adjustments, but no supporting documentation for the 15 percent external obsolescence adjustment. (*Id*. at Addendum C.) Arrasmith submitted no information about why he determined that an obsolescence adjustment was necessary or how the percentage was determined. Because an obsolescence adjustment is a significant adjustment and no information was submitted, the court can give little weight to Arrasmith's cost approach.

Arrasmith's comparable sale approach relied on three sales to determine a real market value of $1,271,500. (*Id*. at 20.) None of those three properties was a maxi-storage facility like the subject property. Even though one of the properties was built in 1981, Arrasmith made no age adjustment. (*Id*.) The available storage for the three comparable properties varied from 12,000 square feet to 47,065 square feet. (*Id.*) The subject property has total storage of 33,460 square feet. (*Id*.) Arrasmith made no adjustment for size. Given the lack of comparability of the three properties to the subject property, the court gives little weight to Arrasmith's comparable sales approach.

"Any property that generates income can be valued using the income capitalization approach." *NYEI v.Umatilla County Assessor*, TC-MD No 100605D at 19 (Jan 13, 2012) (citing Appraisal Institute, *The Appraisal of Real Estate* 447 (13th ed 2009)). "In the income

capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach." *Id*. (Citing *The Appraisal of Real Estate* at 445.) "Anticipation is defined as 'the perception that value is created by the expectation of benefits to be derived in the future.' " *Id*. (Citing *The Appraisal of Real Estate* at 35.) Because the primary use of the subject property is a commercial business, both parties determined the subject property's real market value using the income approach.

"[T]he income approach should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate." *Confehr v. Multnomah County Assessor*, TC-MD No 110621D at 14 (Feb 27, 2012) (citing *Bauman et al v. Dept. of Rev.*, 6 OTR 426, 433 (1976)); *see also Valley River Ctr. Et Al v. Dept. of Rev.*, 6 OTR 368, 372 (1976). Even though the subject property opened for business in June 2007, Arrasmith's income approach was based on one year of historical data. One year of historical data is insufficient. However, because both parties agree that the subject property's gross income is $145,030, and other relevant expense information was submitted, the court considers the income approach. (Ptf's Ex 1 at 1; Def's Ex A at 21.)

Arrasmith determined a vacancy rate after surveying various properties in the area, including one maxi-storage facility that reported a vacancy rate of 28 percent. (*Id*. at 22.) The vacancy rate reported for the three comparable properties ranged from 30 percent to 60 percent. (*Id*. at 20.) Arrasmith determined a vacancy rate of 16 percent. (*Id*. at 22.) That rate is not supported by the subject property's actual experience, the other maxi-storage facility in the area, or the three comparable properties that are mini-storage facilities. Smith determined a vacancy

rate of 43.8 percent. (Ptf's Ex 8.) That rate is not a stabilized vacancy rate because Plaintiff projects that by 2012 the vacancy rate will be 35 percent and in 2013 the vacancy rate will be approximately 26 percent. (Ptf's Ex 4, 8.) The court lacks sufficient evidence to determine a vacancy rate when the income is stabilized.

Arrasmith and Smith agree that the subject property's operating expenses excluding property taxes and interest were $15,675 for tax year 2009. (Ptf's Ex 2 at 2; Def's Ex A at 23.) Smith provided evidence that the subject property's operating expenses increased in 2010, commenting that operating expenses are a "variable amount as a percentage of revenue that fluctuates with occupancy." (Ptf's Ltr at 1, Mar 9, 2012.) The court accepts Plaintiff's 2010 operating expense estimate of $18,000 (rounded). (Ptf's Ex 2 at 2.) Arrasmith included a reserve for replacement, computing the expense using four percent rate multiplied times the effective gross income. The court accepts Arrasmith conclusion that a four percent reserve for replacement is an appropriate expense.

Because there is insufficient evidence to compute a vacancy rate, the court cannot determine an operating income.

To determine a property's real market value, the direct capitalization analysis divides the forecast net operating income of the property for the tax year by the capitalization rate. Arrasmith testified that he determined a seven percent capitalization based on "market sales." (See Def's Ex A at 24.) Arrasmith relied on the three properties that he used in the comparable sales approach and one sale dated May 31, 2008, for which no property characteristic information other than a "correction Statutory Warranty Deed" was submitted. (*Id.* at Addendum B.) For one of the four comparable sales, Arrasmith did not compute a capitalization rate. (*See id.* at 24.) The range of capitalization rates was 5.50 percent to 8.10 percent. (*Id.*)

Arrasmith concluded that seven percent was a reasonable rate before "adding [property] tax rate." (*Id*.) Arrasmith's "adjusted cap rate" was 8.43 percent. (*Id*.) Based on the evidence, the comparable properties selected by Arrasmith are not comparable to the subject property. The first property is "[f]ive buildings, * * * [b]uilt in 1981" and there is no indication that those buildings are commercial storage facilities. (Def's Ex A, Addendum B at 36.) Even though it is not a maxi-storage commercial facility, the second property, a 107 unit mini-storage with 1800 square feet of office/shop space that was built in 2006, bears some similarity to the subject property. (*Id*. at 37.) Arrasmith does not compute a capitalization for the third property and no physical description was provided for the fourth property. Smith provided no evidence to support his capitalization rate other than testifying that Arrasmith relied on an "8.46 percent" capitalization rate at the BOPTA hearing. One sale of a mini-storage facility is insufficient evidence for the court to determine a capitalization rate for the subject property, a maxi-storage facility.

## III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that Plaintiff did not carry its burden of proof. The court concludes that the parties failed to submit

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

sufficient evidence for the court to determine a real market value using any of the three valuation approaches. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of May 2012.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on May 31, 2012. The Court filed and entered this document on May 31, 2012.*